VENABLE LLP
Tyler G. Welti (SBN 257993)
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone: (415) 653-3750
Facsimile: (415) 653-3755
tgwelti@venable.com

Colin B. Vandell (SBN 240653)
2049 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone: (310) 229-9900
Facsimile: (310) 229-9901
cvandell@venable.com

Mitchell Y. Mirviss (*pro hac vice*)
750 East Pratt Street, 9th Floor
Baltimore, MD  21202
Telephone: (410) 244-7412
Facsimile: (410) 244-7742
mymirviss@venable.com

Attorneys for Plaintiff, SPACE EXPLORATION
TECHNOLOGIES CORP.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP., <br><br> Plaintiff, <br><br> v. <br><br> CALIFORNIA COASTAL COMMISSION, a California state agency; CARYL HART, in her personal capacity and her official capacity as a Commissioner and Chair of the Commission; PALOMA AGUIRRE, in her official capacity as a Commissioner of the Commission;  DAYNA BOCHCO, in her official capacity as a Commissioner of the Commission; JUSTIN CUMMINGS, in his personal capacity and his official capacity as a Commissioner of the Commission; LINDA ESCALANTE, in her official capacity as a Commissioner of the Commission; MEAGAN HARMON, in | Case No. 2:24-cv-08893-SB-SK <br><br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

her official capacity as a Commissioner of the Commission; SUSAN LOWENBERG, in her official capacity as a Commissioner of the Commission; ANN NOTTHOFF, in her official capacity as a Commissioner of the Commission; CATHERINE RICE, in her personal capacity and her official capacity as a Commissioner of the Commission; EFFIE TURNBULL-SANDERS, in her official capacity as a Commissioner of the Commission; ROBERTO URANGA, in his official capacity as a Commissioner of the Commission; MIKE WILSON, in his personal capacity and his official capacity as a Commissioner of the Commission; and GRETCHEN NEWSOM, in her personal capacity and her official capacity as Alternate Commissioner of the Commission; KATE HUCKELBRIDGE, in her official capacity as the Executive Director of the Commission; and CASSIDY TEUFEL, in his official capacity as Deputy Director of the Commission's Energy, Ocean Resources, and Federal Consistency Division,

Defendants.

# I.    INTRODUCTION

1.     This case is about a state agency—Defendant California Coastal Commission (the Commission)—egregiously and unlawfully overreaching its authority. First, the Commission has engaged in naked political discrimination against Plaintiff Space Exploration Technologies Corp. (SpaceX) in violation of the rights of free speech and due process enshrined in the First and Fourteenth Amendments of the U.S. Constitution. Rarely has a government agency made so clear that it was exceeding its authorized mandate to punish a company for the personal political views and statements of its largest shareholder and CEO. Second, the Commission is trying to unlawfully regulate space launch programs—which are critical to national security and other national policy objectives—at Vandenberg

Space Force Base (the Base), a federal enclave and the world's second busiest spaceport.

2.    The Commission, an agency of the State of California, is charged with regulating the use of land and water within the state's coastal zone. For decades, the Commission has, without fail, agreed with the longstanding position of the U.S. Department of the Air Force (Air Force) that the Base's commercial space launch programs are federal agency activities that are not subject to the Commission's permitting authority or control. Indeed, from its formation in 1972 until now, the Commission never once disputed this. And for decades, the Commission has repeatedly concurred in determinations by the Air Force pursuant to the Coastal Zone Management Act (CZMA) that the Base's launch programs are consistent with policies protecting California's coastal resources. Even today, the Commission continues to treat every other commercial launch operator's launch programs at the Base as federal agency activities, as demonstrated by recent concurrences relating to other commercial launch providers.

3.    Now, however, years after the Base's Falcon 9 program was first approved by the Air Force and other federal agencies—and after the Commission itself recently found Falcon 9 launches are consistent with coastal resource protections—the Commission has decided to ignore the law, longstanding federal policy, its own established practices and findings, and the legal and constitutional limitations on its authority to impose a different standard on SpaceX. Specifically, at an October 10, 2024 hearing, the Commission refused to concur with a proposal by the Air Force to increase from 36 to 50 the number of launches that SpaceX can perform at the Base. And the Commission now insists that SpaceX's launch program at the Base is federally licensed or permitted activity, and that SpaceX must obtain a coastal development permit (CDP) from the Commission to conduct launches, regardless of compliance with the CZMA.

4.    Before the Commission's October 2024 hearing on the Air Force's

proposal, the Air Force completed a comprehensive environmental review involving numerous federal agency partners, and it worked with the Commission to identify and implement a host of measures—far beyond what is legally required—to mitigate any impact that the increased launch cadence might have on coastal resources. The Commission's own staff recommended concurrence in detailed staff reports. But at the hearing, the Commission nonetheless voted 6-4 not to concur. At the hearing, both the Commissioners and staff also again demanded that SpaceX obtain a CDP to conduct launches, even though the Commission has never required other operators to obtain one.

5.     The Commission's public-hearing record shows it acted based on overt political bias. There was no pretext—the political basis of the Commission's action was plain for all to see. Several Commissioners expressly stated that they decided not to concur based not on concerns about impacts to coastal resources, but instead on the political views held by SpaceX's largest shareholder and CEO, Elon Musk. And several Commissioners made biased and retaliatory comments in demanding that SpaceX obtain a burdensome permit and be subject to additional regulatory control by the Commission, regardless of CZMA compliance.

6.     As Commissioner Caryl Hart said at the October 2024 hearing, the basis for the decision was not that a commercial operator with a space launch program at the Base was increasing its annual launch cadence, but rather that *SpaceX* was doing so: "The concern is with *SpaceX* increasing its launches, not with the other companies increasing their launches . . . we're dealing with a company . . . the head of which has aggressively injected himself into the Presidential race and made it clear what his point of view is." Other Commissioners weighed in with similarly biased, irrelevant concerns about Mr. Musk's politics, including the following, for example:

a. Commissioner Gretchen Newsom read a prepared statement complaining about "Elon Musk [] hopping about the country,

FIRST AMENDED COMPLAINT

spewing and tweeting political falsehoods and attacking FEMA while claiming his desire to help the hurricane victims with free Starlink access to the internet."

b. Commissioner Mike Wilson proclaimed his concerns that Mr. Musk controls "one of the most extensive communications networks on the planet," and that, "just last week," Mr. Musk was "speaking about political retribution on a national stage."

c. Commissioner Dr. Justin Cummings "share[d] some concerns . . . Commissioner Wilson brought up" regarding use of Starlink and Mr. Musk's political beliefs: "And so while . . . we are all trying to operate in this apolitical space, we do know that the person who controls these companies has enough power to not work in the best interest, when they feel like it, of our allies."

7.     Even leaving aside their irrelevance to the decision, these purported "concerns" are based on a gross misunderstanding of the actual facts, which show SpaceX's vital support of the military and civilian interests of both the United States and its allies.[1]

8.     To make it even clearer that the Commission's decision was based on political biases and other irrelevant, misplaced concerns, the Commission recently approved another commercial space launch operator launching up to 60 times a year from the Base. The Commission accepted that this other operator's launch program, including launches of commercial payloads, is federal agency activity that does not require a CDP. Apart from their disagreement with Musk's personal politics, no Commissioner identified any basis to distinguish that operator's launch program

---

[1] Officials with the U.S. Department of Defense and the Ukrainian government officials have repeatedly rebutted the Commissioners' false allegations that SpaceX acted in a manner contrary to U.S. national security interests. *See infra* 33-34 at footnote 11.

from SpaceX's.

9. Thankfully, the fundamental rights of free speech and due process enshrined in the Constitution prohibit precisely this kind of political witch-hunting and abuse of power by state-agency officials.

10. But the Commission's unconstitutional overreach does not stop at punishing SpaceX for its largest shareholder and CEO's constitutionally protected speech, beliefs, and practices that have no relevance to the proposed launches' effects on coastal resources—the actual issue pending before the Commission. Its actions to regulate the Falcon 9 launch program are further prohibited by three additional, separate legal principles:

    a. The Commission's decision interferes with the operations of the *national* space launch program conducted at a U.S. Air Force base. The CZMA gives the federal government, not state governments, power to control federal agency activities on federal land. This exclusive authority and broad area of federal control preempts any application of state law, especially state law that would interfere with the federal government's control of operations on a U.S. military base.

    b. The launch facilities at the Base are situated on a "federal enclave" protected by the Constitution from state regulation. Military bases are paradigmatic examples of federal enclaves that the Constitution expressly places under exclusive federal jurisdiction. The Commission's intrusion upon national defense and intelligence interests and the operations of the U.S. military on a federal enclave is clearly prohibited.

    c. The Commission's own governing statute, the California Coastal Act of 1976 (Coastal Act), expressly states that it does not apply to federal land—going so far as to define "coastal land" subject to the

law to exclude all federal territory. The Commission's decision therefore violates the very foundation of the Commission's purported authority.

11.     Finally, the Commission's purported justification for intruding into the national security and other federal interests implicated by SpaceX's launch program—that some of SpaceX's launches at the Base are commercial—misses the mark. The Base's *entire* Falcon 9 launch program is critical to the national security and space transportation interests of the United States. The Commission's effort to separate out launches that it labels as driven by purely commercial interests is both misinformed and inconsistent with federal law, policy, and defense strategy.

12.     For these reasons, the Commission's punitive decision, violating core Constitutional protections of free speech and due process, undermines U.S. national security and is blatantly illegal, trampling over (i) federal law; (ii) exclusive federal jurisdiction over military bases and other federal enclaves; and (iii) the Commission's own governing statutory boundaries.

13.     Through this lawsuit, SpaceX seeks to protect these fundamental rights by (i) obtaining a declaration that the Commission's actions unconstitutionally punish SpaceX, impermissibly usurp federal law governing federal land and federal programs, and even vault past the statutory boundaries limiting the Commission's authority; (ii) enjoining the Commission from enforcing the Coastal Act's permit requirements against SpaceX; and (iii) assessing compensatory and punitive damages against those Commissioners whose animus against SpaceX and its CEO motivated the Commission's biased, retaliatory actions.

## II.     PARTIES

14.     Plaintiff SpaceX is a privately held American space technology and transportation company that is incorporated and headquartered in Texas. SpaceX maintains facilities at and launches Falcon 9 rockets from Space Launch Complex 4 (SLC-4) at the Base in Santa Barbara County, California. Elon Musk is the largest

shareholder of SpaceX. He serves as its CEO and chairs its board of directors.

15.    Defendant California Coastal Commission is a quasi-judicial state agency created by the California Coastal Act of 1976, California Public Resources Code §§ 30000 *et seq.*, with the express power to sue and be sued in federal court. *See* Pub. Res. Code §§ 30334(b), 30803(a).

16.    Individual Defendant Caryl Hart is and at all relevant times was a voting Commissioner and Chair of the Commission.

17.    Individual Defendant Paloma Aguirre is and at all relevant times was a voting Commissioner of the Commission.

18.    Individual Defendant Dayna Bochco is and at all relevant times was a voting Commissioner of the Commission.

19.    Individual Defendant Justin Cummings is and at all relevant times was a voting Commissioner of the Commission.

20.    Individual Defendant Linda Escalante is and at all relevant times was a voting Commissioner of the Commission.

21.    Individual Defendant Meagan Harmon is and at all relevant times was a voting Commissioner of the Commission.

22.    Individual Defendant Susan Lowenberg is and at all relevant times was a voting Commissioner of the Commission.

23.    Individual Defendant Ann Notthoff is and at all relevant times was a voting Commissioner of the Commission.

24.    Individual Defendant Catherine Rice is and at all relevant times was a voting Commissioner of the Commission.

25.    Individual Defendant Effie Turnbull-Sanders is and at all relevant times was a voting Commissioner of the Commission.

26.    Individual Defendant Roberto Uranga is and at all relevant times was a voting Commissioner of the Commission.

27.    Individual Defendant Mike Wilson is and at all relevant times was a

voting Commissioner of the Commission.

28.    Individual Defendant Gretchen Newsom at all relevant times was Alternate for Commissioner Ann Notthoff. Ms. Newsom served as a voting Commissioner on matters relating to the Falcon 9 launch program at the Base.

29.    Individual Defendant Kate Huckelbridge is and at all relevant times was the Executive Director of the Commission. Defendant Huckelbridge is responsible for the direction and supervision of activities undertaken by the Commission.

30.    Individual Defendant Cassidy Teufel is and at all relevant times was Deputy Director of the Commission's Energy, Ocean Resources, and Federal Consistency Division.

31.    The individual Defendants named above (collectively referred to as the "Individual Defendants") are officers or agents of the Commission and are being sued in their official capacities as officers or agents of the Commission, in connection with SpaceX's claims for declaratory and injunctive relief and for attorney's fees and costs. In these official capacities, the Individual Defendants and their employees, officers, agents, and assigns are charged with following and implementing the federal and state laws and regulations governing the management of California's coastal resources.

32.    In addition, the following Individual Defendants are also sued in their personal capacities for one or more claims for damages under 42 U.S.C. § 1983: Commissioners Hart, Wilson, Rice, Cummings, and Newsom, as set forth below.

## III.    JURISDICTION AND VENUE

33.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (federal civil-rights jurisdiction). This action asserts claims arising under the Supremacy Clause, U.S. Const. Art VI, cl. 2; the doctrine of federal preemption; the CZMA, 16 U.S.C. §§ 1451, *et seq*.; the First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983; and 42 U.S.C. § 1988.

34.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 based on U.S. Const. Art. I, § 8, cl. 17 and the federal enclave doctrine, which provide that conduct on a federal enclave is governed by federal law. This case concerns a space launch program on Vandenberg Space Force Base, and "[i]t is well-settled . . . that Vandenberg is a federal enclave under the federal government's exclusive legislative jurisdiction—and has been since 1943." *Haining v. Boeing Co.*, No. 2:12-CV-10704-ODW, 2013 WL 4874975, at *2 (C.D. Cal. Sept. 11, 2013) (citing *Taylor v. Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 480-81 (2000)). As such, any state law that purportedly vests the Commission with jurisdiction does not apply on the Base. The State did not reserve jurisdiction to regulate activity on the Base when it ceded the land to the federal government. And Congress has not expressly provided that the Base is subject to the Coastal Act, a state law enacted long after the federal government assumed jurisdiction.

35.     In addition to having original jurisdiction under the federal enclave doctrine, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over SpaceX's claim under the Coastal Act. That claim is so related to the federal causes of action that they together form part of the same case or controversy.

36.     This Court is empowered to provide declaratory and injunctive relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65. This Court has jurisdiction to order prospective relief in the form of a declaratory judgment and an injunction against Defendants to end continuing violations of federal law by the Commission's officers and employees acting in their official capacities as officers of an agency of the State of California. It also has jurisdiction to award SpaceX compensatory and punitive damages for its injuries.

37.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events giving rise to this action occurred in this District, including the launch operations at the Base that

Defendants seek to regulate in violation of federal law. Additionally, the Commission and individual Defendants maintain an office in Ventura, California, which is in this District.

38.    SpaceX has satisfied all exhaustion requirements, or no such requirements may be applied to SpaceX on the claims and facts alleged in this Complaint.

## IV.    LEGAL BACKGROUND

### A.    Coastal Zone Management Act

39.    Congress enacted the CZMA in 1972 "to preserve, protect, develop, and, where possible, to restore or enhance the resources of the Nation's coastal zone." 16 U.S.C. § 1452.

40.    The "coastal zone" includes "coastal waters," "adjacent shorelands," "islands, transitional and intertidal areas, salt marshes, wetlands, and beaches." It excludes "lands the use of which is by law subject solely to the discretion of . . . the Federal Government." *Id.* § 1453(1).

41.    Coastal states implement the CZMA's policies through federally approved coastal management programs. *Id.* § 1455(d). A coastal management program must identify, among other things, the state's coastal zone boundaries, permissible coastal uses, and "enforceable policies" governing coastal zone use. *Id.*; *see id.* § 1453(6a) (defining enforceable policy). States must exclude from their coastal zones "lands owned, leased, held in trust or whose use is otherwise by law subject solely to the discretion of the Federal Government, its officers or agents." 15 C.F.R. § 923.33(a).

42.    Section 307 of the CZMA requires federal agencies to coordinate with coastal states to ensure that federal action "within or outside the coastal zone that affects" coastal resources is consistent with the enforceable policies of approved coastal management programs. 16 U.S.C. § 1456(c). This is known as "federal consistency review."

43.    The CZMA and its implementing regulations identify different types of federal agency actions requiring federal consistency review and establish distinct review procedures for each type. Two types of actions reviewable under the CZMA are relevant here: "federal agency activity" and "federally licensed or permitted activity." *See* 15 C.F.R. Pt. 930 Subpts. C & D.

44.    Federal agency activity includes "any functions performed by or on behalf of a federal agency in the exercise of its statutory responsibilities." 16 U.S.C. § 1456(c)(1)(A); 15 C.F.R. § 930.31(a). Federal agency activity need only be "consistent to the maximum extent practicable" with a federally approved coastal management program. 16 U.S.C. § 1456(c)(1)(A); 15 C.F.R. § 930.32(a)(1). At least 90 days before approving federal agency activity, federal agencies must notify the state either that the activity will not have coastal effects (by submitting a "negative determination") or that the activity having coastal effects will be consistent to the maximum extent practicable with the enforceable policies of the state's approved coastal management program (by submitting a "consistency determination"). 16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. §§ 930.35, 930.36. The state may either concur or object. 15 C.F.R. § 930.41. The state may also issue a "conditional concurrence" subject to specific conditions, which is treated as an objection if the federal and state agencies cannot come to an agreement on the state's conditions. *Id.* § 930.4. Ultimately, federal agency activity can proceed over the state's objection if the agency concludes the activity is consistent to the maximum extent practicable. *Id.*

45.    Another type of federal action subject to consistency review is "[f]ederally licensed or permitted activity" (hereinafter, "federally permitted activity"). 16 U.S.C. § 1456(c)(3)(A); 15 C.F.R. § 930.51. Federally permitted activity must be fully consistent with the enforceable policies of a coastal management program. 16 U.S.C. § 1456(c)(3)(A); 15 C.F.R. § 930.57. A state may review only those federally permitted activities affecting the coastal zone that are listed in its coastal management program. The state can request permission from the

National Oceanic and Atmospheric Administration (NOAA) to review unlisted activities, but unlisted activities are otherwise not subject to state review. 15 C.F.R. § 930.54. To demonstrate consistency, the federal permit applicant must submit a consistency certification to the state. 16 U.S.C. § 1456(c)(3)(A); 15 C.F.R. § 930.57. The state has six months to review a certification. 15 C.F.R. §§ 930.60(a), 930.62(a). If the state objects to the certification, the federal agency is prohibited from issuing the permit, and the activity cannot proceed, unless the Secretary of Commerce finds the activity "is consistent with the objectives" of the CZMA "or is otherwise necessary in the interest of national security," thus overriding the state's objection. 16 U.S.C. § 1456(c)(3)(A); 15 C.F.R. § 930.64; *see* 15 C.F.R. Pt. 930 Subpt. H (appeal process).

**B.    California Coastal Act**

46.    The Coastal Act serves as California's implementation of the CZMA and constitutes "California's coastal zone management program within the coastal zone for purposes of the [CZMA]." Cal. Pub. Res. Code § 30008.

47.    The Coastal Act established the Commission as the California state agency responsible for reviewing federal agency actions affecting the coastal zone for consistency with the federally approved California coastal management program. *Id.* § 30330.

48.    The Commission includes twelve voting members who are selected by the Governor, the Senate Committee on Rules, and the Speaker of the Assembly, six of whom are elected officials of local governments and six of whom are appointed from the public at large. *Id.* § 30301.

49.    California's coastal zone includes the land and water area of "the State of California" extending seaward to the outer limit of the State's jurisdiction and inland generally 1,000 yards from the mean hightide line. *Id.* § 30103. The Coastal Act recognizes that federal land is "excluded from the coastal zone pursuant to [the CZMA]." *Id.* § 30008; *see also* 15 U.S.C. § 1453(1); NOAA & California Coastal

Commission, *Combined State of California Coastal Management Program and Final Environmental Impact Statement* at 40 (Aug. 1977).

50.    The Base is federal land that is excluded from the coastal zone.

51.    The Coastal Act requires a CDP for development within the coastal zone. *Id.* § 30600(a). The Commission or a local jurisdiction with permitting authority must issue a CDP if a proposed development will be consistent with the enforceable policies of the Coastal Act. *Id.* §§ 30604(a), 30200(a).

52.    Development outside the coastal zone is not subject to the Coastal Act's CDP requirement, even if it causes impacts inside the coastal zone. *Id.* § 30604(d); 14 Cal. Code. Regs. § 13050.5(b); *Sierra Club v. Cal. Coastal Comm'n*, 35 Cal. 4th 839, 848, 855 (2005).

## V.    FACTUAL BACKGROUND

### A.    SpaceX and its service to the U.S. Space Program

53.    SpaceX was founded in 2002 with the audacious goal of making life multiplanetary. In the 22 years since, the company has made giant strides toward that goal, transforming the space launch industry in the process and becoming the world's leading launch services provider. SpaceX's customers include NASA, the United States defense and intelligence communities, foreign governments, and commercial satellite operators and telecommunications companies around the world.

54.    SpaceX's Falcon 9 rocket is the most reliable rocket ever flown. Falcon rockets have performed well over 400 successful missions with a success rate well over 99%. Falcon first stages are the only orbital-class rocket stages capable of landing, recovery, and reuse, and SpaceX has successfully landed and reused them well over 300 times to date. This substantially reduces marine debris associated with rocket launches. SpaceX first launched Falcon 9 from the Base in 2013. It conducted 28 Falcon 9 launches from the Base in 2023 alone.

55.    SpaceX is one of only two launch services providers certified to perform the most critical launches for the United States' national security and

intelligence communities. In 2020, the Space Force, which is within the Air Force, selected SpaceX to launch not less than 40% of all National Security Space Launch (NSSL) payloads for the U.S. government through at least 2027. Due to challenges with the other awardee's launch vehicle readiness, SpaceX has actually been assigned more than 50% of NSSL missions during this contract period. SpaceX's Falcon rockets are critical to fulfilling the U.S. government's NSSL missions, as it remains the *only* operational launch system currently certified to launch such missions. Falcon 9 is also the only American launch vehicle currently routinely delivering astronauts, supplies, and science to the International Space Station for NASA.

56.    The U.S. government recognizes that all of SpaceX's launches, including its commercial launches, contribute to the overall national security space launch enterprise. As a certified NSSL program launch services provider, SpaceX is contractually required to share data with the U.S. Government for *every single one of its launches*, whether carrying a U.S. government payload or not. This mandatory federal government data collection is conducted pursuant to U.S. government mission assurance activities for which the U.S. Government pays SpaceX.

57.    Falcon 9 also delivers Starlink and Starshield satellites into orbit. Starshield, leveraging the Starlink satellite constellation and ground infrastructure, provides secure satellite communications to multiple agencies within the Department of Defense. In 2023, the Space Force awarded SpaceX an initial $70-million contract to bolster Starshield's capabilities, using Starlink infrastructure for critical national security, defense, and emergency response operations for the Department of Defense and other U.S. federal agencies. *See* Unshin Lee Harpley, *Space Force Awards Contract to SpaceX for Starshield, Its New Satellite Network*, AIR & SPACE FORCES MAGAZINE (Oct. 4, 2023), https://www.airandspaceforces.com/space-force-contract-spacex-starshield/.

58.    Separately, SpaceX has other, very substantial, national security space

contracts with the U.S. Government relating to Starshield. The Department of Defense recently increased its project spending on the military's Proliferated Low Earth Orbit Satellite-Based Services program more than tenfold, from $900 million to more than $13 billion. Under the original $900 million budget, most of the task orders were awarded to Starshield. *See* Sandra Erwin, *Pentagon's Commercial Satellite Internet Services Program Soars to $13 Billion*, SPACENEWS (Oct. 29, 2024), https://spacenews.com/pentagons-commercial-satellite-internet-services-program-soars-to-13-billion/.

59.    SpaceX's launches carrying Starlink satellites are thus necessary for SpaceX to fulfill critical contractual obligations to U.S. government agencies related to the implementation of the Starshield program.

**B.    The federal government's reliance on commercial space operators**

60.    For decades, Congress has recognized the critical importance of commercial space launch operators like SpaceX to the nation's space program. In the Commercial Space Launch Act of 1994, as amended, Congress found that "the private sector in the United States has the capability of developing and providing private launching, reentry, and associated services that would complement the launching, reentry, and associated capabilities of the United States Government." 51 U.S.C. § 50901(a)(4). Congress also found "space transportation . . . is an important element of the transportation system of the United States, and in connection with the commerce of the United States there is a need to develop a strong space transportation infrastructure with significant private sector involvement." *Id.* § 50901(a)(8).

61.    In the National Defense Authorization Act of 2004, Congress declared it "the policy of the United States for the President to undertake actions appropriate to ensure, to the maximum extent practicable, that the United States has the capabilities necessary to launch and insert United States national security payloads into space whenever such payloads are needed in space." 10 U.S.C. § 2273(a). Such

actions include "at a minimum, providing resources and policy guidance to sustain" (*id.* § 2273(b)):

> (1) the availability of at least two space launch vehicles (or families of space launch vehicles) capable of delivering into space any payload designated by the Secretary of Defense or the Director of National Intelligence as a national security payload;
>
> (2) a robust space launch infrastructure and industrial base; and
>
> (3) the availability of rapid, responsive, and reliable space launches for national security space programs to--
>
> (A) improve the responsiveness and flexibility of a national security space system;
>
> (B) lower the costs of launching a national security space system; and
>
> (C) maintain risks of mission success at acceptable levels.

62.     In the National Defense Authorization Act of 2013, Congress directed the Department of Defense to "maximize the use of the capacity of the space transportation infrastructure of the [Department of Defense] by the private sector of the United States" and to "encourage commercial space activities by enabling investment . . . in the space infrastructure of the [Department of Defense]." *Id.* § 2276(a). In the National Defense Authorization Act of 2024, Congress again emphasized the central role of the private sector in space-related defense activities. For example, Congress enabled the "Secretary of a military department" to "provide to [] commercial entit[ies] supplies, services, [and] equipment" as needed to increase commercial space launch capacity. Pub. Law 118-31 § 1603(b).

63.     Consistent with these statutory directives, the Department of Defense has for many years contracted with commercial operators like SpaceX to carry out national space program activities, and now relies exclusively on commercial launch services. The Department of Defense has made clear that advancing the country's national defense and security goals requires "increase[d] collaboration with the

private sector in priority areas, especially with the commercial space industry, leveraging its technological advancements and entrepreneurial spirit to enable new capabilities." Department of Defense, *2022 National Defense Strategy* at 19-20, *available at* https://media.defense.gov/2022/Oct/27/2003103845/-1/-1/1/2022-NATIONAL-DEFENSE-STRATEGY-NPR-MDR.PDF. The Department of Defense has also said it "will benefit by making commercial solutions integral—and not just supplementary—to national security space objectives." Department of Defense, *Commercial Space Integration Strategy* (2024) at 1, *available at* https://media.defense.gov/2024/Apr/02/2003427610/-1/-1/1/2024-DOD-COMMERCIAL-SPACE-INTEGRATION-STRATEGY.PDF.

64.    The U.S. Space Force also recently explained that commercial space capabilities, including launches, are critical to the national security interests of the United States. Department of the Air Force, *U.S. Space Force Commercial Space Strategy* (Apr. 8, 2024), *available at* https://www.spaceforce.mil/Portals/2/Documents/Space%20Policy/USSF_Commercial_Space_Strategy.pdf.

**C.    Commercial space launch operations at Vandenberg Space Force Base**

65.    The military has owned and operated the Base for almost 85 years. In ceding the land on which the Base is located to the U.S. Government, California did not reserve authority to apply its state laws to the land. The Army established the Camp Cooke garrison on the property in 1941 and transferred the site to the Air Force in 1957. Soon after, the Air Force established the Base as a missile and space launch facility and launched the first missile from there in 1958.

66.    In 1996, the Base became the site of the world's first spaceport supporting space launches by commercial operators. Today, the Base is the world's second busiest launch facility. The Base is also the West Coast's only federal launch facility, providing critical capacity for the nation's space program.

67.    Space launches have occurred at the Base for many years with no significant effects on coastal resources either on or around the Base. For example,

wildlife monitoring has shown that launches have had no significant effects to coastal wildlife, including sea birds and pinnipeds. In its 2023 Supplemental Environmental Assessment (Supplemental EA) for Falcon 9 launch activities at the Base, the Air Force explained that "[Western Snowy Plover] monitoring . . . over the past two decades . . . has routinely demonstrated that [] behavior is not adversely affected by launch noise or vibrations." Supplemental EA at 4-25.[2] The Air Force has also "determined there are generally no substantial behavioral disruptions or anything more than temporary [e]ffects" from past launches on pinnipeds and other species. *Id.* at 4-38.

68.    Since 1979, public access to beaches in the vicinity of the Base have been subject to an access restriction agreement between the Air Force, the State of California, and Santa Barbara County. The agreement provides that the Air Force will notify the County prior to a launch that an evacuation is necessary and empowers Santa Barbara County to evacuate members of the public and enforce temporary access restrictions. The State and County have extended this agreement on multiple occasions.

69.    For decades, the Air Force has treated commercial space operations by SpaceX and other commercial operators at the Base as "federal agency activity" under the CZMA and determined that launches are consistent to the maximum extent practicable with the California coastal management program. For example, in 1998, the Air Force made a consistency determination for the Evolved Expendable Launch Vehicle commercial launch program at the Base (CD-049-98). In 2003 and 2005, the Air Force made negative determinations regarding SpaceX's Falcon program (ND-103-03 and ND-088-05). In 2020, the Air Force made a negative determination for the United Launch Alliance's Vulcan Centaur launch program (ND-0027-20). In

---

[2] *Available at* https://www.vandenberg.spaceforce.mil/Portals/18/documents/Environmental/EIAP-2023-05-1_SEA_SpaceX_Falcon9CadenceIncrease.pdf.

2021, the Air Force made a negative determination for ABL Space Systems' RS1 launch program (ND-0020-21) and a consistency determination for Blue Origin's Orbital Launch Site (CD-0010-21). And in 2023, the Air Force made a consistency determination for a Phantom Space Corporation launch facility with a launch cadence of 60 flights (CD-0010-22).

70.    Until its new demand that SpaceX obtain one, the Commission had never required any commercial space launch operator, including SpaceX, to obtain a CDP.

71.    The Department of Defense has repeatedly made clear to the Commission that activities on military installations in California, including the Base, are federal agency activities, not federally permitted activity subject to state permit requirements. For example, on October 25, 2022, "on behalf of the military Services in California, and consistent with previous communications on this uniquely federal issue," the Navy rejected the Commission's "request[] that the Coastal Development Permit (CDP) process be utilized where a private entity is involved in the military's federal activity." The Navy explained:

> Any federal activity, lease or project undertaken on a military installation, is by definition not in the coastal zone. All activities taking place on federally owned [Department of Defense] land, including those that utilize private entities, are done so in a manner exercising our statutory authorities. Federal activities include a range of activities where a Federal agency makes a proposal for action initiating an activity or series of activities.

Ex. A. In a November 2, 2022 letter (Ex. B), the Air Force similarly found that another commercial space operator's proposed launch program at the Base "is a federal activity being conducted outside the coastal zone." The Air Force rejected the Commission's request that it withdraw a previously submitted consistency determination for this activity and apply for a CDP. The Air Force emphasized it "had fulfilled its statutory commercial space launch responsibilities on [the Base] for decades, during which the Coastal Commission has never asserted that any

commercial space project was a private commercial development requiring a CDP." Unlike with respect to that operator, however, the Commission has continued to demand that SpaceX obtain a CDP.

72.    The Commission, in turn, has reviewed the Air Force's negative determinations and consistency determinations for commercial space operations at the Base as federal agency activity and concurred. *See, e.g.*, ND-103-03 Concurrence (addressing the Base's Falcon launch program) (Ex. C); ND-088-05 Concurrence (addressing modifications to the Falcon program) (Ex. D); ND-0027-20 Concurrence (addressing the Base's Vulcan Centaur Program);[3] ND-0020-21 Concurrence (addressing the Base's ABL Space Systems Company's RS1 vehicle launches).[4]

73.    Consistent with the Air Force's longstanding positions that launches from the Base are federal agency activities subject to state consistency review under Section 307(c)(1) of the CZMA, launches are not listed as federally permitted activities in the California coastal management program.

74.    No space launch operator has ever applied for or been issued a CDP.

**D.    The Base's Falcon 9 launch program**

75.    SpaceX currently leases from the Air Force land at the Base that is used to support the Falcon 9 launch program. Under the lease, the Air Force retains ultimate authority over the use of the land and launch facilities. For example, the Air Force "reserves the right to use or share" the leased facilities "as necessary to support its own programs" and "to grant shared use . . . to other services within the Department of Defense, federal agencies, state agencies, and commercial space

---

[3] *Available at* https://documents.coastal.ca.gov/reports/2020/11/F14/F14-11-2020.pdf at 2-4.

[4] *Available at* https://documents.coastal.ca.gov/reports/2021/10/F10/F10-10-2021.pdf at 11-12.

launch operators in the furtherance of the purposes of" the Commercial Space Launch Act. The federal government also retains authority to enter the leased facilities "without escort, at all times for any purposes not inconsistent with Licensee's quiet use and enjoyment of them."

76.     Consistent with its longstanding treatment of commercial space operations at the Base as federal agency activity, the Air Force made negative determinations regarding the Base's Falcon 9 launch program in 2010 (ND-055-10), 2014 (ND-0035-14), 2015 (ND-0027-15), and, as further explained below, 2023 (ND-0009-23). The Commission concurred with each determination. *See* ND-055-10 Concurrence, Ex. E at 2; ND-0035-14 Concurrence, Ex. F at 3; ND-0027-15 Concurrence, Ex. G at 3; ND-0009-23 Concurrence, Ex. H at 5. It did not require SpaceX to obtain a CDP.

77.     These determinations were supported by robust National Environmental Policy Act review by the Air Force, interagency consultation under Section 7 of the Endangered Species Act with the U.S. Fish and Wildlife Service and National Marine Fisheries Service, and Commercial Space Launch Act review by the Federal Aviation Administration. The Air Force prepared environmental assessments (EAs) in 2011, 2016, and 2018, concluding that Falcon 9 program activities would not significantly impact coastal resources.[5]

78.     The Air Force also monitors and mitigates environmental effects of the Base's launch programs. In collaboration with Space Launch Delta 30 of the Space Force, SpaceX monitors protected species, including the western snowy plover, California least tern, California red-legged frog, southern sea otter, and pinnipeds.

---

[5] 2011 EA, *available at* https://apps.dtic.mil/sti/pdfs/ADA612280.pdf; 2016 EA, *available at* https://www.vandenberg.spaceforce.mil/Portals/18/documents/Environmental/EIAP-2016-04-1_EA_Falcon9_Boost-back.pdf; 2018 Supplemental EA, *available at* https://www.vandenberg.spaceforce.mil/Portals/18/documents/Environmental/EIAP-2018-01-31_SEA_Falcon9_Launch-Boost-back.pdf.

SpaceX also assists in sonic boom monitoring at multiple sites even though sonic booms from Falcon 9 launches do not occur at levels that are harmful to humans or wildlife. The Space Force has also collaborated with Santa Barbara County on a highly successful strategy to minimize beach access restrictions that the Space Force sometimes implements to reduce risk to the public.

**E.    The Commission's review of Falcon 9 launch cadence increases**

79.    In 2023, the Air Force evaluated increasing the launch cadence of Falcon 9 rockets at the Base to up to 36 launches annually. As with prior Falcon 9 program activities, the proposed cadence increase underwent environmental and safety review by multiple federal agencies. The Air Force prepared a Supplemental EA in accordance with the National Environmental Policy Act and concluded the cadence increase would not significantly affect coastal resources. Supplemental EA at 4-50. The Air Force and SpaceX also committed to measures to mitigate coastal effects, including minimizing the need for temporary access restrictions, compensation for any unrecovered marine debris, and ongoing biological monitoring. *Id*. at 4-49 to 4-50.

80.    After thorough review, the Air Force also made a negative determination (ND-0009-23) under the CZMA. The Commission concurred on May 5, 2023, stating: "With these commitments [to minimize coastal impacts], Commission staff agrees that the proposed increase to 36 Falcon 9 launches per year at [the Base] and designation of a new offshore landing area will not adversely affect coastal zone resources. The proposed launch activities are similar to those concurred with by the Commission in CD-049-98 and by the Executive Director in ND-0027-15. We therefore concur with your negative determination made pursuant to 15 CFR 930.35 of the NOAA implementing regulations." ND-0009-23 Concurrence, Ex. H at 5.

81.    Just a few months later, however, the Commission reversed course, voting on December 15, 2023, to renege on its concurrence with the Air Force's

FIRST AMENDED COMPLAINT

2023 negative determination. The Commission also asked the Air Force to provide more information about the 36-launch cadence increase and potential coastal effects.

82. The Commission sent the Space Force a "remedial action letter" on February 16, 2024, asking the Space Force to submit a consistency determination for the 36-launch cadence increase and "limit SpaceX launch azimuths and scheduling in order to avoid further adverse impacts to public coastal access and recreation . . . ." Ex. I at 3.

83. Notwithstanding that the Commission had already previously concurred in the negative determination, the Air Force provided the Commission the requested information and agreed to submit a consistency determination (CD-0003-24) for the 36-launch cadence increase. On March 7, 2024, the Air Force provided another consistency determination, which included additional mitigation measures addressing the Commission's concerns and again found the 36-launch cadence increase to be consistent with the California coastal management program. Ex. J.

84. On March 28, 2024, Commission staff released a detailed staff report recommending that the Commission concur with the Air Force's March 2024 consistency determination.[6] The report discussed the Air Force's commitment to implement measures to further address the Commission's concerns with biological resources, marine debris, and fisheries impacts. Although the report recommended concurrence, it disputed the Air Force's longstanding policy and the Commission's longstanding practice of recognizing and reviewing commercial launch operations at the Base as federal agency activity. Instead, the report said, "SpaceX's space launch activities are not a government program and are carried out solely by a private entity" and that the program "would be operated by a private company to serve its business objectives and would only occasionally launch materials at the behest of"

---

[6] *Available at* https://documents.coastal.ca.gov/reports/2024/4/w13a/w13a-4-2024-report.pdf.

the Air Force. March 2024 Report at 7. Although Commission staff "agreed to bring forward the proposed project for the Commission's consideration as a consistency determination," they warned that "future projects will continue to be considered on a case-by-case basis and different review approaches will be used when appropriate." *Id.*

85.    At its meeting on April 10, 2024, the Commission rejected its staff's recommendation and voted not to concur at that time. The Commission again questioned the Air Force's longstanding policy of treating private launches at the Base as federal agency activity. Kristina Kunkel, acting as a non-voting member of the Commission on behalf of the State Lands Commission, said: "I just don't think that SpaceX should be able to skirt the requirements for a CDP when there's clear intent to conduct primarily for-profit business activity and not federal activity." Commission Chair Hart stated that "everyone has agreed" the Commission should distinguish SpaceX's supposedly "private" launches from Department of Defense payloads, and pushed for "consideration of whether a CDP should be required," which a majority of the Commissioners supported. Defendant Teufel, the Deputy Director of the Commission's Energy, Ocean, Resources, and Federal Consistency Division, stated that "it's worth us trying to figure out whether [requiring a CDP] is appropriate," but noted that "we've already approved" launch cadence increases for private companies without requiring a CDP "in the past," thereby "set[ting] a precedent for how we're approving these kinds of permits." The Commission decided to again revisit review of the Air Force's consistency determination for the 36-launch cadence increase at a subsequent hearing.

86.    On May 10, 2024, to address the additional concerns raised at the April 10 meeting, the Air Force provided a briefing on operations at the Base. The Air Force then submitted additional information about the Falcon 9 launch operations at the Base.

87.    At its meeting on May 10, 2024, Commission members raised

numerous concerns unrelated to potential effects on coastal resources. For example, Commissioner Wilson questioned "the national security public benefit of concentrating that much power, literally power, communication power into one company that we are enabling in this case, in a company that has already shown that it will play in international conflicts directly at the will of a single human being." Commissioner Wilson even acknowledged that this concern "is probably broader than maybe this organization can deal with." Commissioner Cummings further commented: "When the Ukraine was preparing to launch an attack on Russia, Elon Musk decided to suspend Starlink, which prevented them from being able to carry out their attack. And with Ukraine being one of our allies one would suspect that that would kind of violate our strategies around national defense."

88.    In a May 30, 2024 report,[7] Commission staff reversed their prior recommendation that the Commission concur with the Air Force's consistency determination, and instead recommended that the Commission object. The report disputed the Air Force's position that the Falcon 9 program at the Base is federal agency activity, stating that "Space Force must demonstrate that SpaceX is performing all its launch activities on behalf of the Space Force and that Space Force is responsible and accepts liability for all of SpaceX's launch activities" to show that the Falcon 9 program is federal agency activity. May 2024 Report at 7.

89.    On June 7, 2024, the Air Force sent a letter responding to the Commission's report. Ex. K. The Air Force explained that the Falcon 9 program would be carried out "consistent to the maximum extent practicable with the enforceable policies" of the California coastal management program and that "federal activities, including commercial space activities on [the Base], are not subject to the California Coastal Zone Management Program's (CZMP) Coastal

---

[7] *Available at* https://documents.coastal.ca.gov/reports/2024/6/w10a/w10a-6-2024-report.pdf.

Development Permit (CDP)." The Air Force reiterated that "[l]aunches on [the Base] constitute 'federal agency actions' and fall within the federal [consistency determination] process," and that "[t]his position has been articulated to the [Commission] throughout this [consistency review] process" and in prior correspondences.

90.    The Commission postponed a vote on the consistency determination at its June 2024 meeting. The Air Force then continued to meet and work with the Commission to address the Commission's concerns.

91.    On July 25, 2024, Commission staff issued a third report on the Air Force's consistency determination for the 36-launch cadence increase, this time recommending conditional concurrence.[8] Specifically, the report recommended imposing the following conditions of concurrence, which include measures related to effects outside of the coastal zone: (1) an enhanced on-Base biological monitoring program, (2) off-Base sonic boom minimization measures, (3) off-Base acoustic and biological monitoring, (4) a lighting management plan, (5) enhanced coastal access and recreation, (6) marine debris payments, and (7) a commercial and recreational fishing coordination plan. This new report again took the position that Falcon 9 launches are not federal agency activity and require a CDP. July 2024 Report at 12.

92.    The Air Force worked with the Commission and agreed to conditions 4-7 but not the other conditions, as explained in an August 6, 2024 letter to the Commission. Ex. L.

93.    At its meeting on August 8, 2024, the Commission adopted the report in full and conditionally concurred in the Air Force's consistency determination. During the hearing, the Commission raised numerous concerns unrelated to potential effects on coastal resources. For example, Commissioner Wilson said:

---

[8] *Available at* https://documents.coastal.ca.gov/reports/2024/8/Th9c/Th9c-8-2024-report.pdf.

FIRST AMENDED COMPLAINT

> And we see, you know, actors in that space both engaging in foreign military activities, engaging in misinformation, dabbling in misinformation within the social media spheres in which they're in and those sorts of things, which makes me question our ability to manage the benevolency of this private industry under this umbrella of the public good, which our military is supposed to be part of our public good and national security as well.

Commissioner Cummings also asked questions about national security concerns based on false, debunked conspiracy theories unrelated to potential effects on coastal resources:

> [W]hat we saw about a year ago was that Starlink was shut down when one of our allies was trying to utilize that technology to attack one of our adversaries. When the Ukraine was trying to conduct a drone attack on Russia, Starlink shut down that technology and prevented them from utilizing that technology for an attack that they were trying to do to defend their nation against a foreign invader, who we've identified as being one of our enemies. So the notion that what we're doing and the approval of these rocket launches is for national defense, you know, it's concerning to me when some of our allies are not being allowed to utilize the technology that's being deployed in these launches when they need it most.

94.    After the hearing, the Air Force continued to work with the Commission to resolve its concerns. On September 13, 2024, the Air Force responded to the Commission with proposed measures responsive to the Commission's first three conditions of its conditional concurrence. Ex. M. On September 16, 2024, the Commission responded that these measures were inadequate. Ex. N. The Air Force ultimately capitulated to the Commission's conditions, including additional monitoring that the Air Force and federal wildlife agencies found not to be needed and that would cost commercial space operators, including SpaceX, and the Air Force millions of dollars a year to implement.

## F.    The Commission's continued demands that SpaceX obtain a CDP

95.    Since reopening its consistency determination on the 36-launch increase in December 2023, the Commission has repeatedly asserted that the Base's

Falcon 9 launch program is not federal agency activity and demanded that SpaceX obtain a CDP to conduct Falcon 9 launches for commercial customers.

96.     On a September 13, 2024 call with SpaceX and in several emails, Defendant Cassidy Teufel demanded on behalf of the Commission that SpaceX obtain a CDP to conduct future commercial launches. He threatened enforcement against the Falcon 9 launch program and further stated that the Commission will not agree to cadence increases if SpaceX does not obtain a CDP. SpaceX responded by reiterating its position, shared by the Air Force, that the Base's commercial space launch programs are not subject to the Coastal Act's CDP requirement.

97.     On September 27, 2024, the Commission again stated its CDP demand in a staff report evaluating a consistency determination that the Air Force prepared for a proposed cadence increase to 50 launches annually (CD-0007-24).[9] The report states the Commission's position that Falcon 9 launches are federally permitted activities requiring a CDP and says that the Commission's "expectation [is] that SpaceX will be required to seek the Commission's authorization through submittal of a consistency certification and/or coastal development permit application." Sept. 2024 Report at 8. The report claims that "the primary purpose of the proposed SpaceX launch activities is to further expand and support SpaceX's commercial satellite internet and telecommunications network" and that SpaceX only "periodically launches satellites and payloads under contract for a variety of federal government agencies." *Id.* at 2.

98.     The Commission also sent SpaceX a letter on September 27, 2024, stating that SpaceX must obtain a CDP, including an "after-the-fact" CDP for past launches, indicating that the Commission believes past launches violated the Coastal

---

[9] The Staff Report is available at https://documents.coastal.ca.gov/reports/2024/10/th9a/th9a-10-2024-report.pdf. The July 2024 CD for the cadence increase is attached as Exhibit P.

Act's CDP requirement. Ex. O.

99.    At its October 10, 2024 meeting,[10] the Commission rejected its staff's recommendation to concur with the Air Force's consistency determination addressing the cadence increase to 50 launches. The Commissioners and Commission staff continued to claim that Falcon 9 launches are federally permitted activity requiring a CDP. The Commission made clear that SpaceX must apply for a CDP regardless of whether it concurred in the Air Force's consistency determination. For example, Commission Chair Hart stated that "[i]t is essential that SpaceX submit a CDP" and [t]here is no other way forward in my opinion." She disagreed with the Air Force that commercial space launches are federal agency activity outside the Commission's permitting jurisdiction, noting that "we're going to hit a wall here." Commissioners Hart, Escalante, Bochco, Lowenberg, Wilson, Cummings, and Newsom also stated that SpaceX must obtain a CDP.

100.    The Commission also made clear that its disparate treatment of SpaceX was rooted in animosity toward SpaceX and the political beliefs of its largest shareholder and CEO, Elon Musk, not concern for the coastal zone. After talking at length about concerns with changes in Department of Defense leadership following the November 2024 election, Commission Chair Hart said explicitly: "The concern is with SpaceX increasing its launches, not with the other companies increasing their launches." She explained, "we're dealing with a company . . . the head of which has aggressively injected himself into the Presidential race and made it clear what his point of view is." Other Commissioners made clear they also decided based on their political disagreements with Mr. Musk. Commissioner Newsom, for instance, said that "Elon Musk is hopping about the country, spewing and tweeting political falsehoods and attacking FEMA while claiming his desire to help the hurricane

---

[10]    A recording of the Commission's October 10, 2024 meeting is available at https://cal-span.org/meeting/ccc_20241010/.

victims with free Starlink access to the internet." Commissioners Aguirre and Cummings voiced similar concerns regarding the political uses of Starlink. As these statements show, the impact of the proposed launch cadence increase on the coastal region was the last topic on the Commissioners' minds at the October 2024 meeting.

101. The Commissioners also raised other concerns wholly unrelated to coastal effects. Commissioner Newsom, for example, spoke at length about SpaceX's employment practices, citing reports alleging unlawful retaliation and unsafe working conditions. These same vague "concerns" regarding SpaceX's employment practices were later echoed by Commissioners Cummings and Aguirre. Cummings even admitted SpaceX's labor practices fall outside the Commission's purview, stating that "[t]here's certain things that we would love to see *that are outside of our purview*" before continuing to discuss unnamed reports regarding SpaceX's supposed labor practices. To be clear, SpaceX vehemently denies that it engages in any unlawful labor or employment practices or that its workplaces are unsafe, but even if these "concerns" were substantiated, they have nothing to do with the impacts of the Falcon 9 launch program at the Base.

102. The Commissioners also repeatedly cited long-debunked conspiracy theories regarding the use of SpaceX technologies by foreign governments and concerns about Mr. Musk's motivations for seeking federal contracts. Commissioner Wilson wanted to "acknowledge" that Starlink gives Mr. Musk control over "one of the most extensive communications networks on the planet," and further stated that "just last week" Mr. Musk was "speaking about political retribution on a national stage." Commissioner Cummings later raised similar concerns about Mr. Musk's perceived unilateral control over the Starlink system. Cummings stated, "I do share some concerns . . . Commissioner Wilson brought up . . . . [L]ast year we did see the owner of Starlink shut down Starlink when one of our allies was going to attack one of our adversaries. And so while . . . we are all trying to operate in this apolitical space, we do know that the person who controls these companies has enough power

to not work in the best interest, when they feel like it, of our allies."[11] Comments from other Commissioners similarly show that they acted based on flawed and inexpert national security concerns rather than concerns within the scope of their state mandate regarding preservation of the coastal zone.

103.   No one stated or argued that animus toward Mr. Musk and/or SpaceX had no place in the Commission's deliberation, should not affect the Commission's decision in any way, and/or should be disregarded completely.

104.   Following these many attacks against Mr. Musk and SpaceX for political views, alleged business practices, and other matters unrelated to the

---

[11] While immaterial to SpaceX's claims, many of the Commissioners' biased and retaliatory statements are simply wrong. Contrary to Commissioner Cummings's accusations, the Department of Defense has repeatedly and publicly stated that SpaceX "has been a great partner on [military aid to Ukraine], and they have done everything we have asked—everything." John Plumb & Ryan Evans, *Spacepower and the Private Sector*, WAR ON THE ROCKS, at 15:19 (Apr. 19, 2024), https://warontherocks.com/2024/04/spacepower-and-the-private-sector/. The Department of Defense has explained that SpaceX has not only been "very cooperative with the entire United States government and the government of Ukraine, they have been forward leaning in identifying and bringing information to us." Department of Defense Space Activities in Review of the Defense Authorization Request for Fiscal Year 2025 and the Future Years Defense Program: Hearings before the U.S. Senate Comm. on Armed Servs. (May 21, 2024) (Testimony of John D. Hill, Deputy Assistant Sec'y of Defense) at 41, *available at* https://www.armed-services.senate.gov/imo/media/doc/5-21-24_sub_strat_forces.pdf. The Vice Prime Minister of Ukraine said, "Starlink is indeed the blood of our entire communications infrastructure now," noting that the network has saved "thousands of lives," and that "[d]efinitely Elon Musk is among the world's top private donors supporting Ukraine. Starlink is an essential element of our critical infrastructure." https://twitter.com/FedorovMykhailo/status/158934203385860097. Secretary of State Anthony Blinken explained that "Starlink has been a vital tool for Ukrainians to be able to communicate with each other and particularly for the military to communicate in their efforts to defend all of Ukraine's territory." Tony Czuczka, *Blinken Says Musk's Starlink Should Keep Giving Ukraine Full Use*, BLOOMBERG NEWS, Sept. 10, 2024, *available at* https://www.bloomberg.com/news/articles/2023-09-10/blinken-says-musk-s-starlink-should-keep-giving-ukraine-full-use.

Commission's authority, the Commission voted 6-4 against SpaceX increasing its yearly total of Falcon 9 launches from the Base. The majority votes were cast by Commissioners Hart, Newsom, Uranga, Bochco, Aguirre, and Escalante.

105.    Commissioner Newsom celebrated the Commission's decision on social media later that day, expressly acknowledging that the Commission acted politically and "cite[d] Elon Musk's politics in rejecting SpaceX launches."



106.    In view of the Commissioners' egregious conduct, after SpaceX filed this action, California Governor Gavin Newsom stated that the Commission's consideration of Mr. Musk's politics was unconstitutional, siding with SpaceX in

FIRST AMENDED COMPLAINT

the lawsuit and publicly commenting: "I'm with Elon."[12]

107.  On November 1, 2024, the Air Force sent the Commission a letter stating that it would proceed with up to 50 launches per year, including up to 14 additional launches during the last two months of 2024. The Air Force reiterated that the launches "are critical to our country's national security" and comply with the CZMA. The Air Force further stated that it and other federal agencies would continue to meet regularly with Commission staff "to support conservation objections and national security requirements."

108.  Despite these developments, the Commission has not dropped its demand that SpaceX obtain a CDP to conduct launches from the Base or its position that SpaceX launches are federally permitted activity.

## VI.   CLAIMS

### COUNT I: For Declaratory and Injunctive Relief
### (Coastal Zone Management Act)
### (Against All Defendants, Including the Individual Defendants
### in their Official Capacities)

109.  Plaintiff incorporates by reference all preceding allegations.

110.  The Commission lacks authority for its actions under the CZMA. First, the Falcon 9 launch program is federal agency activity, not federally permitted activity requiring a consistency certification. Second, contrary to the Commission's claims, the Base is not within the "coastal zone" as defined by the CZMA.

111.  The CZMA and its implementing regulations distinguish between federal agency activities and federally permitted activities. Distinct requirements and differing degrees of state authority apply to each type of activity under the CZMA. "Federal agency activity" is any function carried out by or on behalf of a federal

---

[12] Christopher Cadelago & Debra Kahn, *Newsom on SpaceX Rejection: 'I'm with Elon'*, POLITICO, Oct. 18, 2024, https://www.politico.com/news/2024/10/18/elon-newsom-musk-california-spacex-00184408.

agency to exercise its statutory responsibilities.

112.    It is the Air Force's longstanding position that commercial space launches at the Base, including the Falcon 9 launch program, are federal agency activities under the CZMA. SpaceX agrees that commercial space launches and infrastructure at the Base, including Falcon 9 launch operations, are federal agency activities. For decades, the Commission also agreed and repeatedly concurred in determinations by the Air Force that commercial space launch programs at the Base are federal agency activities that are consistent with the enforceable policies of California's coastal management program.

113.    But the Commission is now attempting to regulate the Base's commercial space launches as federally permitted activity and has directed SpaceX to submit a consistency certification. Contrary to the Commission's position, the Base's Falcon 9 launch program is federal agency activity. Falcon 9 is the most reliable, reusable, economical rocket ever created, and it is the workhorse of the national space program. A robust Falcon 9 launch program at the Base is integral to ensuring "the availability of rapid, responsive, and reliable space launches for national security space programs," as required by Congress. 10 U.S.C. § 2273.

114.    As a bipartisan group of fourteen California Members of Congress explained in a comment letter supporting the cadence increase for the Base's Falcon 9 launch program, "[s]pace launches from [the Base] provide a critical national security capability for the U.S. Department of Defense [] and intelligence community." Quoting the 2024 Department of Defense's Commercial Space Integration Strategy, they explained that "integrating commercial launch services into the national security space architecture is 'critical to enhancing U.S. resilience and strengthening deterrence in the 21st century.' Federal law and national policy also provide clear direction on this subject, including in the Commercial Space Launch Act and the National Space Policy."

115.    The Air Force similarly explained in its July 2024 consistency

FIRST AMENDED COMPLAINT

determination for the 50-launch cadence increase that a robust commercial space launch program at the Base serves the Air Force and fulfills its statutory responsibilities:

> The Proposed Action [*i.e.*, increased launch capacity at the Base] is needed to meet current and anticipated near-term future U.S. Government launch requirements for national security, space exploration, science, and the Assured Access to Space process of the NSSL program. It is the policy of the U.S. to ensure that the U.S. has the capabilities necessary to launch and insert national security payloads into space whenever needed, as described in 10 U.S.C. § 2773. The Proposed Action is also needed so that SpaceX can continue to implement U.S. Government missions while simultaneously meeting its increasing commercial launch demands.

Ex. P at 2 (CD-0007-24).

116. The Commission also claims that the Base's land on which the Falcon 9 launch program operates is part of the coastal zone. *See* Sept. 2024 Report at 12-13; July 2024 Report at 14-15. This is wrong because the Base is federal land, which the CZMA expressly excludes from constituting part of the coastal zone subject to the CZMA. 16 U.S.C. § 1453(1); 15 C.F.R. § 923.33(a).

117. The Commission's demand that SpaceX submit a consistency certification for the Base's Falcon 9 launch program is also unlawful under the CZMA because the federally approved coastal management program does not list space launches as federally permitted activities that could affect the coastal zone. Nor has NOAA authorized the Commission to review commercial space launches as "unlisted federal license or permit activities." *See* 15 C.F.R. § 930.54. Nor could NOAA, because, as explained above, the Base's launch program is federal agency activity under the CZMA.

118. The Commission's attempt to regulate the Base's commercial space launches as federally permitted activity occurring within the coastal zone, and its demand that SpaceX submit a consistency certification, harm SpaceX. The Commission's demand for a consistency certification, when implemented, would

FIRST AMENDED COMPLAINT

trigger a review period by the Commission of six months or more, as opposed to a 90-day period for consistency determinations. The demand would also require SpaceX to incur substantial expense to prepare consistency certifications that are redundant of the Air Force's consistency determinations. The demand would further require the Falcon 9 launch program to be fully consistent with the California coastal management program's enforceable policies instead of consistent to the maximum extent practicable, which is the less demanding consistency standard applicable to federal agency activities. And if the Commission objected, the launch program could proceed only after a successful, formal administrative appeal to NOAA. By contrast, if reviewed as federal agency activity, the launch program can proceed over the Commission's objection given the Air Force's repeated findings that the activity is consistent to the maximum extent practicable with the California coastal management program's enforceable policies.

119.   The Commission's erroneous position that parts of the Base where SpaceX operates are within the coastal zone also harms SpaceX. Contrary to the Commission's position, the Base is federal land that is not part of the coastal zone, and thus impacts on the Base are not subject to consistency review under the CZMA.

120.   Accordingly, the Commission's demand that SpaceX submit a consistency certification for the Base's Falcon 9 launch program should be declared unlawful under the CZMA in the circumstances presented, declared unenforceable against SpaceX, and enjoined. If not declared unlawful and enjoined, the Commission's demands will irreparably harm not only SpaceX but also the important federal interests served by the Base's Falcon 9 launch program.

### COUNT II: For Declaratory and Injunctive Relief
### (Preemption)
### (Against All Defendants, Including the Individual Defendants
### in their Official Capacities)

121.   Plaintiff incorporates by reference all preceding allegations.

122.   Space operations at the Base are federal agency activity overseen by

multiple agencies within the Department of Defense. The Commission agreed with this position for decades. But now, as explained above, the Commission has done an about-face: starting this year, it has repeatedly sought to regulate the Base's Falcon 9 launch program under the Coastal Act and demanded that SpaceX obtain a CDP under that state law. Both the Air Force and SpaceX have steadfastly disagreed. As the Air Force has repeatedly found, the Base's Falcon 9 launch program is federal agency activity that is fully consistent with the California coastal management program and not subject to the Coastal Act's CDP requirement.

123.    SpaceX seeks a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the Commission's demand that SpaceX obtain a CDP to conduct Falcon 9 launches at the Base is preempted.

124.    The Commission's application of its claimed state law permitting authority to SpaceX and the Falcon 9 launch program at the Base is preempted because it conflicts with the CZMA and other federal laws in numerous ways.

125.    First, the Commission's attempt to regulate effects on the Base's coastal resources is preempted. The CZMA excludes federal land from the coastal zone subject to the Commission's review for consistency with the coastal management program's enforceable policies. The Base is federal land that is excluded from the coastal zone. Contrary to the CZMA, the Commission seeks to apply the coastal management program's policies and CDP requirement to Falcon 9 launch operations and related effects on the Base.

126.    Second, the Commission's attempt to regulate and demand a permit for federal agency activity is preempted. The CZMA establishes separate and distinct frameworks for state consistency review of federal agency activities and federally permitted activities. A federal agency can override a state agency's finding that a federal agency activity is inconsistent with the state's coastal management program and proceed with the federal agency activity simply by finding that the activity is consistent to the maximum extent practicable. As explained above, the Base's

Falcon 9 launch program is federal agency activity, and the Air Force has issued consistency determinations finding that the launch program is consistent with the state's coastal management program. In conflict with the limited authority the CZMA provides states to review federal agency activity, the Commission seeks to require SpaceX to obtain a CDP, prepare a consistency certification, and obtain the Commission's concurrence to conduct launch operations at the Base, irrespective of the Air Force's finding of consistency. Federal law preempts the Commission's purported authority to impose these requirements on SpaceX.

127.    Third, the Commission's demands that SpaceX obtain a CDP for the Falcon 9 program and implement additional mitigations to comply with the coastal management program also conflict with the Air Force's specific consistency findings in this case and its authority to proceed over the Commission's objection.

128.    The preemptive effect of federal law applies with heightened force to the Commission's actions because they intrude upon national defense and security and seek to regulate activity occurring on a federal enclave. Allowing the Commission to demand a CDP and conduct lengthy review of commercial space launches at a federal military base would hamstring both the national space program and the U.S. commercial space launch operators on which the program relies. Congress clearly never intended such an outcome in passing the Commercial Space Launch Act or directing the Department of Defense, NASA, and other federal agencies to rely on commercial space launch programs at federal launch sites. Rather, Congress made clear that "providing launch services and reentry services by the private sector is consistent with the national security and foreign policy interests of the United States and would be facilitated by stable, minimal, and appropriate regulatory guidelines that are fairly and expeditiously applied." 51 U.S.C. § 50901(a)(6).

129.    Accordingly, the Commission's demands that SpaceX obtain a CDP should be declared preempted and unlawful under the circumstances presented,

declared unenforceable against SpaceX, and enjoined. If not declared unlawful and enjoined, the Commission's demands will irreparably harm not only SpaceX but also the important federal interests served by the Base's Falcon 9 launch program.

### COUNT III: For Declaratory and Injunctive Relief
### (Preemption—Federal Enclave Jurisdiction)
### (Against All Defendants, Including the Individual Defendants
### in their Official Capacities)

130.    Plaintiff incorporates by reference all preceding allegations.

131.    The Commission's demand that SpaceX obtain a CDP is also unlawful and preempted or displaced under the federal enclave doctrine, under which the Base is governed exclusively by federal law.

132.    The Federal Enclave Clause provides that Congress "shall have power . . . to exercise exclusive Legislation in all Cases whatsoever over such" federal enclave districts "and to exercise like authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings." U.S. Constitution, art. 1, § 8, cl. 17.

133.    The Base is a federal enclave. The U.S. Army acquired the pertinent land on the Base in 1941 by cession. In ceding the land, the State did not reserve authority to apply any state laws to the land. *See Taylor*, 78 Cal. App. 4th at 480 (explaining that state law "in effect when the United States Government accepted jurisdiction over [the Base] . . . [provided] blanket consent to federal jurisdiction [and] rendered Vandenberg a federal enclave"). Nor did the federal government provide for application of existing or subsequently enacted state laws to the Base's land at issue, nor has it since.

134.    The U.S. military has used the base continuously for military purposes since its acquisition in 1941. It has never abandoned the Base for exclusively civilian or non-federal purposes.

135.    The Coastal Act was enacted by the State of California after the state

ceded the land on which the Base was built and, therefore, the Coastal Act is not incorporated into the federal law governing the Base.

136.  The California state legislative approval of cession of the land lacked any reservation subjecting the land to state regulation of coastal conditions under the Coastal Act.

137.  No federal statute gives California the power to impose its state law permitting requirements on launch activity at the Base or any other activity affecting Falcon 9 launches from the Base.

138.  To the contrary, the CZMA and its operative regulations provide that states must exclude from the coastal zone "lands the use of which is by law subject solely to the discretion of . . . the Federal Government," including "lands owned, leased, held in trust or whose use is otherwise by law subject solely to the discretion of the Federal Government, its officers or agents." 16 U.S.C. § 1453(1); 15 C.F.R. § 923.33(a). Even if a federal enclave such as the Base were theoretically subject to federal consistency review by states under the CZMA, at the very most, the CZMA requires the federal government to consult with pertinent state officials and find that actions are consistent to the maximum extent practicable. Nothing in the CZMA requires the federal government to surrender or limit its exclusive jurisdiction under the Federal Enclave Clause over the Base to state permitting conditions.

139.  The Commission's asserted authority under the Coastal Act to demand a CDP for commercial space launches from the Base therefore constitutes an impermissible state regulation of activity on a federal enclave and is prohibited by the Federal Enclave Clause of the U.S. Constitution.

140.  Accordingly, the Commission's demands that SpaceX obtain a CDP should be declared unlawful under the Federal Enclave Clause, declared unenforceable against SpaceX, and enjoined. If not declared unlawful and enjoined, the Commission's demands will irreparably harm not only SpaceX but also the important federal interests served by the Base's Falcon 9 launch program.

**COUNT IV: For Declaratory and Injunctive Relief**
**(California Coastal Act applied on a federal enclave)**
**(Against All Defendants, Including the Individual Defendants**
**in their Official Capacities)**

141.    Plaintiff incorporates by reference all preceding allegations.

142.    Even if the Commission's asserted authority under the Coastal Act to require SpaceX obtain a CDP were not preempted by federal law and prohibited by the Federal Enclave Clause, because the Base is a federal enclave, the Coastal Act could apply to launches on the Base only if it were deemed to constitute federal law. As such, the Coastal Act would be subject to this Court's federal question jurisdiction under 28 U.S.C. § 1331. And this Court therefore would have authority to determine that the Commission and its officers are violating the Coastal Act.

143.    The Commission has asserted that the Coastal Act authorizes it to demand a CDP for commercial space launches occurring on the Base because the Base is part of the coastal zone within the meaning of the Coastal Act. But the Base is located outside the "coastal zone" as defined by the Coastal Act, and thus the Falcon 9 launch program is not subject to the Commission's regulatory authority even under that law. Cal. Pub. Res. Code § 30008; 15 U.S.C. § 1453(1). The Coastal Act therefore plainly prohibits the Commission from requiring SpaceX to obtain a CDP for the Base's Falcon 9 launch program because the Base is federal land that is outside of the coastal zone and beyond the Commission's coastal development permitting jurisdiction. Cal. Pub. Res. Code § 30604(d); 14 Cal. Code Regs. § 13050.5(b).

144.    SpaceX seeks a declaration pursuant to 28 U.S.C. § 2201 that the Commission's demand that SpaceX obtain a CDP for its launch operations at the Base exceeds the Commission's authority and is unlawful under the Coastal Act.

145.    Accordingly, the Commission's demands that SpaceX obtain a CDP should be declared unlawful and in excess of its authority under the Coastal Act,

declared unenforceable against SpaceX, and enjoined. If not declared unlawful and enjoined, the Commission's demands will irreparably harm not only SpaceX but also the important federal interests served by the Base's Falcon 9 launch program.

**COUNT V: For Declaratory and Injunctive Relief, and Damages**
**(Retaliation in Violation of U.S. Const. amend. I; 42 U.S.C. § 1983)**
**(Against All Defendants, Including All Individual Defendants in their Official Capacities, and Against Defendants Hart, Cummings, Wilson, and Newsom in their Personal Capacities)**

146.    Plaintiff incorporates by reference all preceding allegations.

147.    The Commission's 6-4 vote against SpaceX's plan to increase Falcon 9 launches was substantially based upon the Commissioners' bias and animus against SpaceX based on the political views of its largest shareholder and CEO, Elon Musk. It therefore constitutes prohibited retaliation in violation of the First Amendment to the U.S. Constitution, applicable against Defendants pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983.

148.    To prevail on a claim for First Amendment retaliation, a plaintiff must show that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). The Commissioners' public statements and conduct clearly establish each element of this test.

149.    Mr. Musk is the CEO and largest shareholder of SpaceX. Mr. Musk's public political statements and opinions are protected by the First Amendment.

150.    Political speech "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). SpaceX has a right to be free from retaliation for the political views of its owners. *See, e.g.*, *Pagan v. Calderon*, 448 F.3d 16, 30 (1st Cir. 2006) ("When a government

actor discriminates against a corporation based on a protected trait of a [shareholder], . . . the corporation . . . has standing to seek redress.").

151. As the October 10, 2024 hearing and other statements by Commissioners show, the Commission made clear that its actions to not concur with the Air Force's consistency determination and to demand that SpaceX obtain a CDP are motivated by disagreement and concern with Mr. Musk's political expressions.

152. Several Commissioners—including Hart, Cummings, Wilson, and Newsom—made statements showing that political bias and disagreement with the protected speech of Mr. Musk motivated the Commission's actions adversely affecting SpaceX. For example:

a. Commission Chair Hart stated that a factor motivating her to vote to not concur with the Air Force's consistency determination and to demand that SpaceX obtain a CDP was that "we're dealing with a company . . . the head of which has aggressively injected himself into the Presidential race and made it clear what his point of view is."

b. Commissioner Newsom accused Mr. Musk of "hopping about the country, spewing and tweeting political falsehoods and attacking FEMA while claiming his desire to help the hurricane victims with free Starlink access."

c. Commissioner Wilson said that Mr. Musk controls "one of the most extensive communications networks on the planet," and that, "just last week," Mr. Musk was "speaking about political retribution on a national stage."

d. Commissioner Cummings "share[d] some concerns . . . Commissioner Wilson brought up" regarding use of Starlink and Mr. Musk's political beliefs: "And so while . . . we are all trying to operate in this apolitical space, we do know that the person who

controls these companies has enough power to not work in the best interest, when they feel like it, of our allies."

153.   These comments were made during the public hearing as explanations for the Commissioners' decision to not concur in the Air Force's consistency determination and to demand that SpaceX obtain a CDP.

154.   Independent of the concurrence vote, seven Commissioners—including Wilson and Cummings, who voted to concur in the consistency determination— clearly stated their position that SpaceX must obtain a CDP. Of these seven, four Commissioners—Hart, Newsom, Cummings, and Wilson—made explicit that they were substantially motivated by disagreement with Mr. Musk's political expressions.

155.   SpaceX has a right under the First Amendment to conduct its business without retaliation by state officials who disagree with or dislike SpaceX's lawful policies and practices, or the political views of its CEO or owners. None of the policies and practices unlawfully criticized by the Commission pertain to any matter subject to the Commission's lawful purview. Statements by Commissioners, including those quoted above, also show that the Commission's action adverse to SpaceX was substantially motivated by animus and bias against the protected speech of SpaceX and its owner Mr. Musk.

156.   The Commission's actions seeking to regulate SpaceX's Falcon 9 launch program at the Base as federally permitted activity and to require SpaceX to obtain a coastal development permit, and its threatened enforcement actions against SpaceX—which actions are expressly motivated by political disagreement and bias—clearly "would chill or silence a person of ordinary firmness from future First Amendment activities." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 916 (9th Cir. 2012) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds*, 117 S. Ct. 2451 (1997)). Faced with threatened enforcement and the cost and delay of burdensome permitting and approval processes the Commission

unlawfully seeks to impose, "a person of ordinary firmness" would feel constrained from future exercises of the protected activity that prompted the Commission's decision.

157.   It is also clear that, based on this political bias against Mr. Musk, the Commission is treating SpaceX differently than other commercial space launch operators. Commission Chair Hart confirmed that the retaliation was directed at SpaceX. Commission Chair Hart said, "[t]he concern is with SpaceX increasing its launches, not with the other companies increasing their launches." Indeed, the Commission recently approved a cadence of 60 launches per year for another operator and did not demand a CDP. This obvious inconsistent treatment demonstrates the Commission's animus and bias against the protected speech of SpaceX and its owner Mr. Musk.

158.   Accordingly, the Commission's decision to not concur in the Air Force's consistency determination and demands that SpaceX submit a consistency certification and obtain a CDP should be declared unlawful under the First Amendment of the U.S. Constitution, unenforceable against SpaceX, and enjoined. If not declared unlawful and enjoined, the Commission's demands will irreparably harm not only SpaceX but also the important federal interests served by the Base's Falcon 9 launch program.

159.   As a result of Defendants' actions, SpaceX has suffered and will continue to suffer hardship and actual and impending injury, loss, and damage.

160.   Their own public statements at Commission hearings show that Commissioners Hart and Newsom acted with retaliatory animus against Mr. Musk for his political views and acts and voted not to concur based upon these. The Commissioners therefore are liable in their personal capacities for compensatory damages by voting not to concur based on their retaliatory animus toward SpaceX's owner, Mr. Musk.

161.   Additionally, similar hostile statements at Commission hearings by

Commissioners Hart, Newsom, Wilson, and Cummings attacking Mr. Musk and his political views and acts show that they acted with retaliatory animus in demanding that SpaceX obtain a CDP for launches.

162.   Furthermore, Commissioners Hart, Newsom, Wilson, and Cummings acted knowingly, willfully, and maliciously, and with reckless and callous disregard for SpaceX and its CEO's clearly established and constitutionally protected rights, justifying an award of punitive damages in amounts sufficient to punish each of them and discourage others from engaging in similar gross abuse of the public trust and governmental power.

**COUNT VI: For Declaratory and Injunctive Relief, and Damages**
**(Deprivation of Liberty Without Due Process of Law**
**in Violation of U.S. Const. amend. XIV; 42 U.S.C. § 1983)**
**(Against All Defendants, Including All Individual Defendants in their**
**Official Capacities, and Against Defendants Hart, Cummings, Rice, Wilson,**
**and Newsom in their Personal Capacities)**

163.   Plaintiff incorporates by reference all preceding allegations.

164.   Under the Due Process Clause of the Fourteenth Amendment, SpaceX is entitled to have its government permits considered by government officials without taint of political bias and animus.

165.   SpaceX has constitutionally protected liberty and property interests to seek all permits and agency approvals and reviews, without political bias or reprisal, needed to conduct its business of launching Falcon 9 rockets at the Base.

166.   The Due Process Clause prevents a government entity from depriving a plaintiff of a protected interest without "a fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). This requirement applies not only in courts, but also in administrative proceedings regarding licenses and permitting. *See Stivers v.*

*Pierce*, 71 F.3d 732, 741 (9th Cir. 1995).

167.    To state a procedural due process claim, a plaintiff must allege facts showing: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of [adequate] process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). A plaintiff may establish it has been denied its constitutional right to a fair hearing before an impartial tribunal by showing either actual bias on the part of the adjudicator, or the "appearance of partiality that violates due process, even without any showing of actual bias." *Stivers*, 71 F.3d at 741.

168.    Here, the statements by Commissioners Hart, Cummings, Rice, Wilson, and Newsom and the disparate treatment of SpaceX compared to other commercial space launch operators at the Base all provide clear evidence of bias.

169.    SpaceX has constitutionally protected interests to petition the government, including proceedings before the Commission, without facing bias or reprisal. For the reasons set forth above, the October 10, 2024 hearing and other proceedings addressing SpaceX's Falcon 9 launch program at the Base were irremediably tainted by the Commissioners' political bias and animus toward Elon Musk, the CEO and largest owner of SpaceX. The Commission, therefore, interfered with SpaceX's liberty interests protected under the Fourteenth Amendment.

170.    SpaceX also has a constitutionally protected property interest in its business of launching Falcon 9 rockets on the Base. Because the Commission has employed a blatantly biased and partisan process for deciding the conditions for SpaceX's business activities on the Base, retaliating against Mr. Musk and SpaceX for their protected speech about political views and for their employment practices, the Commission has also interfered with SpaceX's property interests protected by the Fourteenth Amendment.

171.    Accordingly, the Commission's decision to not concur in the Air Force's consistency determination and demands that SpaceX submit a consistency

FIRST AMENDED COMPLAINT

certification and obtain a CDP should be declared unlawful under the Fourteenth Amendment of the U.S. Constitution, unenforceable against SpaceX, and enjoined. If not declared unlawful and enjoined, the Commission's demands will irreparably harm not only SpaceX but also the important federal interests served by the Base's Falcon 9 launch program.

172.    As a result of Defendants' actions, SpaceX has suffered and will continue to suffer hardship and actual and impending injury, loss, and damage.

173.    Commissioners Hart, Cummings, Rice, Wilson, and Newsom are liable in their personal capacities for compensatory damages because their biased statements, including statements at the October 10, 2024 Commission meeting, infected the entire proceeding with bias, thereby depriving SpaceX of its right to a fair hearing.

174.    In acting as alleged herein, Commissioners Hart, Cummings, Rice, Wilson, and Newsom acted knowingly, willfully, and maliciously, and with reckless and callous disregard for SpaceX's clearly established and constitutionally protected rights, justifying an award of punitive damages in an amount sufficient to punish these individual Defendants and discourage others from engaging in similar gross abuse of the public trust and governmental power.

## VII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), SpaceX demands a trial by jury on all issues so triable.

## VIII.  REQUEST FOR RELIEF

In light of the foregoing, Plaintiff respectfully requests that the Court grant the following relief:

A.     Declare that SpaceX's Falcon 9 launch program at the Base is "federal agency activity" under the CZMA and does not require a consistency certification;

B.     Enjoin the Commission from regulating the Falcon 9 launch program at the Base as "federally permitted activity" under the CZMA;

FIRST AMENDED COMPLAINT

C.     Declare that the Commission lacks authority to require a CDP for the Base's Falcon 9 launch program operated by SpaceX;

D.     Declare that the Commission's decision to not concur in the Air Force's consistency determination and to demand that SpaceX submit a consistency certification and obtain a CDP violate the First and Fourteenth Amendment of the U.S. Constitution and are unenforceable against SpaceX;

E.     Enjoin the Commission from enforcing the Coastal Act and its CDP requirement against SpaceX in connection with the Falcon 9 launch program at the Base;

F.     Award SpaceX its compensatory damages, in an amount subject to proof at trial, against the specified Individual Defendants in their personal capacities under 28 U.S.C. § 1983; or, in the alternative,

G.     Award SpaceX nominal damages against the specified Individual Defendants in their personal capacities, under 28 U.S.C. § 1983;

H.     Award SpaceX punitive damages, in an amount to be determined according to proof at trial, against the specified Individual Defendants in their personal capacities, under 28 U.S.C. § 1983;

I.     Award SpaceX its attorney's fees and costs under 28 U.S.C. § 1988 and other applicable law; and

J.     Grant such other relief to which Plaintiff is justly entitled.

VENABLE LLP

Dated:  November 26, 2024

By:     */s/ Tyler Welti*
Tyler G. Welti
Colin B. Vandell
Mitchell Y. Mirviss (*pro hac vice*)

Attorneys for Plaintiff, SPACE EXPLORATION TECHNOLOGIES CORP.

FIRST AMENDED COMPLAINT