UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES, CORP., <br><br> Plaintiff, <br><br> v. <br><br> CALIFORNIA COASTAL COMMISSION et al., <br><br> Defendants. | Case No. 2:24-cv-08893-SB-SK <br><br> ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT [DKT. NO. 40] |

    Plaintiff Space Exploration Technologies, Corp. (SpaceX) contracts with the U.S. Air Force to launch rockets from the Vandenberg Space Force Base, located on the California coast. When SpaceX sought to increase the frequency of its rocket launches, the Air Force conducted an environmental review and submitted to the California Coastal Commission a determination that the increase is consistent with California's coastal policies. The Commission voted to object to that determination, with some members expressing opposition to the political activities of SpaceX's founder and CEO, Elon Musk. The Air Force nevertheless approved the increase over the Commission's objection, as authorized by federal law. SpaceX now brings this action against the Commission and its members, challenging both their adverse vote and their position that SpaceX needs to seek additional authorization from the Commission for its launches. Defendants move to dismiss for lack of ripeness and standing and for failure to state a claim. The Court held a hearing on March 14, 2025, and now grants the motion with leave to amend.

I.

    This case involves a dispute over the application of two statutes governing activities taking place on coastal land. The Court first describes the regulatory background before turning to the specific facts giving rise to this case.

1

A.

The Coastal Zone Management Act (CZMA) authorizes the U.S. Secretary of Commerce to review and approve coastal management programs submitted by states. 16 U.S.C. § 1455(d). Each management program must identify the coastal zone subject to the program, designate permissible land and water uses, and create enforceable policies governing activity in the coastal zone. *Id*. The CZMA excludes from the states' coastal zones land that is "subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents." *Id*. § 1453(1); 15 C.F.R. § 923.33(a).

California has implemented the CZMA through the California Coastal Act, which constitutes its coastal zone management plan. Cal. Pub. Res. Code § 30008. The Coastal Act established the Commission, an agency with 12 voting members. *Id*. §§ 30300, 30301, 30301.5. The Coastal Act requires those wishing to "perform or undertake any development in the coastal zone" to obtain a coastal development permit (CDP) from either the Commission or a local government. *Id*. § 30600(a). The Coastal Act acknowledges the exclusion of federal land from the coastal zone but asserts residual authority over that land to the extent permitted by law. *Id*. § 30008 ("[W]ithin federal lands excluded from the coastal zone pursuant to the [CZMA], the State of California shall, consistent with applicable federal and state laws, continue to exercise the full range of powers, rights, and privileges it now possesses or which may be granted.").

Two types of activity reviewable under the CZMA are especially relevant here. First, "Federal agency activity" includes "any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities." 15 C.F.R. § 930.31(a). When federal agency activity—including activity outside the coastal zone—affects land or water use in the coastal zone, the CZMA requires the federal agency to submit a "consistency determination" to the relevant state agency (here, the Commission) and ensure that the project is, "to the maximum extent practicable, consistent with the enforceable policies of approved state management programs." 16 U.S.C. § 1456(c)(1)(C). The state agency may concur or object, but the agency may proceed with the activity over the state's objection if it determines that doing so "is fully consistent with the enforceable policies of the management program." 15 C.F.R. § 930.43(d).

Second, persons conducting certain federally permitted activity—i.e., activity that requires a federal license or permit—that affects the land or water in the coastal zone must submit a consistency certification to the state agency,

certifying that "the proposed activity complies with the enforceable policies of the state's approved program and that such activity will be conducted in a manner consistent with the program." 16 U.S.C. § 1456(c)(3)(A). The state agency may object, and, as with federal agency activity, the Secretary of Commerce may override the objection upon determining that the activity is consistent with the objectives of the CZMA or necessary for national security. *Id*.

Federally permitted activity requires a consistency certification in two circumstances. First, the state maintains a list of federally permitted activities that affect coastal use or resources, for which a certification is required. 15 C.F.R. § 930.53(a) ("State agencies shall develop a list of federal license or permit activities which affect any coastal use or resource, including reasonably foreseeable effects, and which the State agency wishes to review for consistency with the management program."). Second, states may request that the Director of the National Oceanic and Atmospheric Association (NOAA) require a consistency certification for federally permitted activities not listed by the state. "If the Director approves the State agency's request, the Federal agency and applicant must comply with the consistency certification procedures," but "[i]f the Director disapproves the State agency's request, the Federal agency may approve the license or permit application and the applicant need not comply with [those] requirements." 15 C.F.R. § 930.54(d). It is undisputed that launch programs are not included among California's listed federally permitted activities that require a consistency certification and that the NOAA Director has not approved any request for such a requirement.

B.

As alleged in the First Amended Complaint (FAC), SpaceX is a launch services provider that works with NASA, the U.S. defense and intelligence communities, foreign governments, and commercial satellite operators and telecommunications companies around the world. Dkt. No. 31 ¶ 53. SpaceX launches its reusable Falcon 9 rockets from the Vandenberg Space Force Base and has been assigned more than half of the U.S. government's national security-related payload launches in recent years, along with other government contracts. *Id*. ¶¶ 54–58. The base is owned by the U.S. military and has been used for space launches for many years. *Id*. ¶¶ 65–67.

For decades, the Air Force (of which the Space Force is now a part) has treated commercial space operations on the base as federal agency activity under the CZMA and has determined that launches are consistent with the California

coastal management program. *Id.* ¶ 69. Until recently, the Commission has never required any commercial space launch operator to obtain a CDP. *Id.* ¶ 70. Moreover, the military has repeatedly informed the Commission of its position that a CDP is not required for commercial space operators launching rockets from the base and that such launches are federal agency activities, not federally permitted activity subject to state permitting requirements. *Id.* ¶ 71. Consistent with that position, the Commission has repeatedly reviewed the Air Force's determinations for commercial space operations at the base as federal agency activity. *Id.* ¶ 72. No space launch operator has ever applied for or been issued a CDP. *Id.* ¶ 74.

The Commission concurred with the Air Force's determinations about the Falcon 9 launch program on the base in 2010, 2014, and 2015 without requiring SpaceX to obtain a CDP. *Id.* ¶ 76. In 2023, the Air Force evaluated increasing the launch cadence of Falcon 9 rockets to 36 launches annually and determined after an environmental review that doing so would not significantly affect coastal resources. *Id.* ¶ 79. The Commission concurred with the Air Force's determination, which included commitments to minimize coastal impacts. *Id.* ¶ 80.

In late 2023 and early 2024, however, the Commission voted to retract its concurrence and requested more information. *Id.* ¶¶ 81–82. The Air Force provided the requested information, along with a new consistency determination with additional mitigating measures. *Id.* ¶ 83. The Commission's staff then released a report recommending that the Commission concur with the consistency determination but disputing that SpaceX's launches constituted federal agency activity. *Id.* ¶ 84. On April 10, 2024, the Commission rejected the recommendation and voted not to concur at that time. *Id.* ¶ 85. Multiple commissioners stated their views that SpaceX's for-profit activities should not be considered federal activity and expressed an interest in considering whether a CDP should be required. *Id.* At a meeting the following month, after the Air Force had provided additional information, two commissioners raised concerns about the role of SpaceX and its founder and CEO, Elon Musk, in international conflicts. *Id.* ¶¶ 86–87.

The Commission's staff then reversed their position, recommending in a May 30, 2024 report that the Commission object to the Air Force's consistency determination. *Id.* ¶ 88. The report also disputed, again, that the Falcon 9 program was federal agency activity. *Id.* The Air Force reiterated that launches on the base were federal agency actions not subject to CDP requirements under the CZMA. *Id.* ¶ 89. In a third report, Commission staff recommended conditional concurrence with the Air Force's determination, proposing seven new conditions and reiterating

the position that Falcon 9 launches require a CDP. *Id.* ¶ 91. After the Air Force agreed to some of the conditions, the Commission adopted the report and conditionally concurred at the August 8, 2024 meeting. *Id.* ¶¶ 92–93. Two commissioners again raised concerns about SpaceX unrelated to potential effects on coastal resources. *Id.* ¶ 93. The FAC alleges that after additional communication, the Air Force "ultimately capitulated to the Commission's conditions, including additional monitoring that the Air Force and federal wildlife agencies found not to be needed and that would cost commercial space operators, including SpaceX, and the Air Force millions of dollars a year to implement." *Id.* ¶ 94.

Since then, the Commission allegedly "has repeatedly asserted that the Base's Falcon 9 launch program is not federal agency activity and demanded that SpaceX obtain a CDP to conduct Falcon 9 launches for commercial customers." *Id.* ¶ 95. Defendant Cassidy Teufel, Deputy Director of the Commission's Energy, Ocean Resources, and Federal Consistency Division, allegedly demanded in September 2024 that SpaceX obtain a CDP, "threatened enforcement against the Falcon 9 launch program," and stated that the Commission would not agree to cadence increases if SpaceX did not obtain a CDP. *Id.* ¶ 96.

Meanwhile, the Air Force evaluated a proposed further increase to 50 SpaceX launches annually, which it again determined was consistent with California's coastal management program. *Id.* ¶ 97. The Commission's September 27, 2024 staff report in response reiterated its position that Falcon 9 launches are federally permitted activities requiring a CDP and stated its "expectation" that SpaceX would "be required to seek the Commission's authorization through submittal of a consistency certification and/or coastal development permit application." *Id.* The same day, the Commission sent SpaceX a letter stating that it must obtain a CDP, including an "after-the-fact" CDP for past launches, which the Commission believed violated the Coastal Act. *Id.* ¶ 98.

The FAC focuses on the Commission's October 10, 2024 meeting, at which the Commission voted 6–4 not to concur in the Air Force's assessment of the proposed 50-launch cadence increase, notwithstanding that the Commission's staff had recommended concurring. *Id.* ¶¶ 99–104. A majority of the commissioners present stated their belief that SpaceX should obtain a CDP. *Id.* ¶ 99. Several commissioners also raised concerns about SpaceX and Musk unrelated to protecting the coastal zone, including Musk's political activities, SpaceX's employment practices, and the use of SpaceX technology by foreign governments. *Id.* ¶¶ 100–02. After the vote, Commissioner Gretchen Newsom celebrated the

decision on social media in a post stating, "California regulators dump on Elon Musk in rejecting SpaceX rocket launches" and sharing an article titled: "California officials cite Elon Musk's politics in rejecting SpaceX launches." *Id*. ¶ 105.

The Air Force decided to proceed with the launch cadence increase despite the Commission's objection, finding that the launches were critical to national security and complied with the CZMA. *Id*. ¶ 107. The Commission, however, "has not dropped its demand that SpaceX obtain a CDP to conduct launches from the Base or its position that SpaceX launches are federally permitted activity." *Id*. ¶ 108.

Less than a week after the October 10 meeting, SpaceX filed this action seeking declaratory and injunctive relief relating to the Commission's vote and its position that SpaceX's launches are not federal agency activity. Dkt. No. 1. Following the Air Force's decision to approve the increased launch cadence, SpaceX filed its FAC, which also added claims for monetary relief against five of the commissioners. Dkt. No. 31. The FAC alleges six causes of action, seeking declaratory and injunctive relief that: (1) the CZMA does not require SpaceX to submit a consistency certification; (2) the Commission's demand that SpaceX obtain a CDP is preempted; (3) the Commission's demand for a CDP is unlawful under the Federal Enclave Clause; (4) the Commission's demand for a CDP violates the Coastal Act; (5) the Commission retaliated against SpaceX for Musk's protected speech in violation of the First Amendment; and (6) the Commission deprived SpaceX of the due process of law by conducting a biased hearing. All six claims are alleged against the Commission, two staff members, and the commissioners in their official capacities. The final two claims also seek actual and punitive damages from five commissioners in their individual capacities (Caryl Hart, Justin Cummings, Mike Wilson, and Gretchen Newsom in both claims and, as to Count 6 only, Catherine Rice).

Defendants move to dismiss all the claims for lack of jurisdiction under Rule 12(b)(1) and Count 6 for failure to state a claim under Rule 12(b)(6). Dkt. No. 40.

II.

Defendants raise a series of jurisdictional and quasi-jurisdictional arguments under Rule 12(b)(1), arguing that: (1) Counts 1–4 are not ripe under either constitutional or prudential ripeness principles; (2) SpaceX lacks Article III standing as to Counts 5 and 6; and (3) all claims against the Commission and

6

Counts 5 and 6 against the commissioners in their official capacities are barred by sovereign immunity. The Court begins with the Article III ripeness and standing challenges. *See Calderon v. Ashmus*, 523 U.S. 740, 745 (1998) (explaining that "we must first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited" before reaching sovereign immunity issues under the Eleventh Amendment).

A complaint must be dismissed under Rule 12(b)(1) if the plaintiff lacks Article III standing to sue. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). The standing doctrine is derived from Article III's limitation on the judicial power of federal courts to hear only "actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* at 338. Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "The irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (cleaned up). The party invoking federal jurisdiction bears the burden of demonstrating that Article III is satisfied. *TransUnion*, 594 U.S. at 442.

The doctrine of ripeness has two components, drawing from both Article III limitations on judicial power and prudential reasons for refusing to exercise jurisdiction. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Constitutional ripeness "is synonymous with the injury-in-fact prong of the standing inquiry." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022). Whether framed as a question of standing or ripeness under Article III, the plaintiff's injury must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id*. (quoting *Lujan*, 504 U.S. at 560).

Jurisdictional challenges under Rule 12(b)(1) may be facial or factual. Here, Defendants specify that they bring a facial attack. Dkt. No. 40 at 2 of 32. Unlike a factual attack, which permits the court to review evidence beyond the complaint, "[i]n a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The court evaluates a

facial attack "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

SpaceX's opposition relies heavily on the declaration of Matthew Dunn, SpaceX's Senior Director of Government Affairs, to supply facts not contained in the FAC. The opposition does not address the fact that Defendants' challenge is facial or identify any authority permitting the Court to consider the declaration. At the hearing, SpaceX argued that the Court could consider the Dunn declaration but appeared to acknowledge that the better course would be for SpaceX to amend its pleading. Defendants' objection to the Dunn declaration is sustained, and the Court does not consider it in connection with Defendants' facial challenge. *See, e.g.*, *MVP Asset Mgmt. (USA) LLC v. Vestbirk*, No. 2:10-CV-02483, 2011 WL 1457424, at *1 (E.D. Cal. Apr. 14, 2011) (disregarding extrinsic evidence submitted with plaintiff's opposition to facial jurisdictional attack).[1]

### III.

The Court turns first to Defendants' ripeness challenge to Counts 1 through 4, which the parties largely address collectively, before addressing the Article III challenge to Counts 5 and 6.

### A.

SpaceX raises two ripeness theories in support of Counts 1 through 4.

---

[1] Defendants request judicial notice of two staff reports and the certified transcript of the October 10, 2024 Commission meeting, which are matters of public record and central to the FAC. Dkt. No. 40-4. SpaceX also requests judicial notice of four staff reports. Dkt. No. 43. Neither party objects to the other's request, and courts may take judicial notice of matters of public record in ruling on a facial jurisdictional attack. *Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017). The Court therefore grants the unopposed requests, although the exhibits do not materially affect the outcome of the motion.

1.

First, SpaceX argues briefly that it has suffered economic and competitive harm from Defendants' efforts to require a consistency certification and CDP. Dkt. No. 42 at 6–7. SpaceX relies principally on the Dunn declaration, which the Court cannot consider in evaluating Defendants' facial challenge. SpaceX argues that it has spent employee time and money responding to the Commission's demands, but the FAC contains no allegations to that effect. SpaceX cites a single statement in Count 5 (alleging retaliation) that "[a]s a result of Defendants' actions, SpaceX has suffered and will continue to suffer hardship and actual and impending injury, loss, and damage." Dkt. No. 31 ¶ 159. This conclusory allegation, which does not identify any particular hardship or injury, does not meet SpaceX's burden to "clearly allege facts demonstrating each element" of Article III standing. *Spokeo*, 578 U.S. at 338 (cleaned up).

SpaceX also argues that as a result of the Commission's position, SpaceX "will spend significant employee resources and millions of dollars to implement monitoring and mitigation measures on federal land." Dkt. No. 42 at 6. Again, this argument is unsupported by the FAC; SpaceX cites only to paragraph 91 of the FAC, which describes measures recommended by Commission staff in July 2024 and says nothing about any costs to SpaceX.

Finally, SpaceX relies on the allegation that the Commission has not demanded a consistency certification or CDP from other commercial space operators to argue that SpaceX has suffered competitive harm. But without allegations establishing any burden on SpaceX, the absence of a burden on its competitors does not show competitive harm.[2] Accordingly, SpaceX has not

---

[2] Although SpaceX does not focus on paragraph 94 of the FAC in connection with its ripeness argument, that paragraph alleges that the Air Force agreed to "additional monitoring that the Air Force and federal wildlife agencies found not to be needed and that would cost commercial space operators, including SpaceX, and the Air Force millions of dollars a year to implement." Dkt. No. 31 ¶ 94. This allegation appears to suggest costs that are not unique to SpaceX. In any event, these costs are alleged to arise from the Air Force's accommodation of the Commission's concerns about the launches' environmental impact, and SpaceX has not explained how those costs have any connection to the Commission's view that a CDP or consistency certification is required.

9

shown on the face of the FAC that Counts 1 through 4 are ripe based on economic or competitive harm already incurred.

2.

The parties focus more heavily on the typical requirements for ripeness in cases challenging a law before it is enforced against the plaintiff. When the threat of enforcement is "sufficiently imminent," the plaintiff need not wait to be subjected to an actual arrest, prosecution, or enforcement action before challenging the law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Instead, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id*. (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The facts alleged here are unlike those in the cases on which the parties rely. SpaceX does not contend that it wishes to take action prohibited by any law. Instead, SpaceX asserts that the Commission has a mistaken understanding of the application of the CZMA and the Coastal Act to SpaceX's launches. But while the FAC plausibly alleges a disagreement between the Commission and SpaceX as to whether a CDP is required,[3] it does not plausibly identify what threatened enforcement it fears. SpaceX wishes to continue launching rockets in cooperation with the Air Force, and the Air Force agrees with SpaceX that it may do so without obtaining a CDP. Accepting as true the FAC's allegations that the Commission takes the position that a CDP is required and has repeatedly demanded a CDP,[4] it is

---

[3] Defendants acknowledge in their motion that "the Falcon 9 launch program does not presently fall within either of the classes of activities for which a consistency certification is required." Dkt. No. 40 at 10. Thus, there does not appear to be a live dispute about consistency certifications, the subject of Count 1.

[4] Defendants argue that the Commission can act only by voting, and that there has not been a vote to demand a CDP or commence enforcement proceedings. But the FAC alleges that the Commission, through its staff, has issued numerous written reports and letters to SpaceX asserting that a CDP is required, and that a majority of the commissioners agreed with that position on the record at the October 10, 2024 meeting. Tellingly, Defendants in their briefing do not dispute that they take the position described by SpaceX. *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (state's refusal to disavow enforcement of challenged statute during litigation was "strong evidence" of a credible threat). Drawing all reasonable inferences in favor of SpaceX, it is not unduly speculative to conclude

not clear on the face of the FAC how the Commission's position or demands injure SpaceX. Notwithstanding the Commission's repeated demands, SpaceX has not submitted a CDP; the Air Force has stood by its position that no CDP is required and has overridden the Commission's objections; and SpaceX has proceeded with its launches. Without more, the allegations in the FAC do not establish that the Commission's position or demands are harming SpaceX.

The FAC contains a single conclusory allegation that one commissioner "threatened enforcement against the Falcon 9 launch program," Dkt. No. 31 ¶ 96, but it does not identify any specific enforcement action that SpaceX fears the Commission will, or can, undertake if SpaceX (with the support of the Air Force) continues to ignore its requests for a CDP. Moreover, despite describing numerous demands by the Commission for a CDP, including in a September 2024 letter asserting that past launches violated the Coastal Act, *id.* ¶ 98, the FAC does not allege that Defendants have initiated any enforcement action against SpaceX or even specified any action they may take.[5] In the absence of such allegations, and particularly in light of the Air Force's position that no CDP is required, the FAC does not identify any threatened enforcement that gives rise to a ripe Article III controversy.

Counts 1 through 4 are therefore dismissed without prejudice for lack of constitutional ripeness.

B.

Count 5 of the FAC alleges that the Commission's 6–4 vote not to concur in the Air Force's consistency determination in October 2024 was in retaliation for Musk's protected speech, in violation of the First Amendment. Dkt. No. 31

---

that the Commission believes SpaceX should obtain a CDP. The jurisdictional question, however, is whether that belief gives rise to a threat of enforcement that supports an Article III case or controversy.

[5] At the October 10, 2024 meeting, one commissioner who believed that it was "essential" for SpaceX to obtain a CDP explained, "I don't really know, you know, what legal mechanisms we have to get them in front of us, but hopefully there are some." Dkt. No. 40-7 at 62:2–3, 17–19.

11

¶¶ 146–62.[6] Defendants argue that SpaceX lacks Article III standing because it has not alleged injury, causation, or redressability related to the vote.

The Court agrees. As alleged in the FAC, after the Commission voted not to concur, the Air Force overrode its objection and allowed SpaceX to increase its launch cadence. The FAC does not plausibly allege how SpaceX was harmed by the Commission's vote, which did not affect SpaceX's ability to launch. The FAC does not allege that SpaceX or Musk have refrained from any protected speech as a result of the vote. SpaceX argues that it has spent time and money responding to burdensome demands and countering enforcement threats, but the allegations it cites principally describe correspondence between the Commission and the Air Force, all of which predate the challenged vote, and none of which identify any instances of SpaceX expending resources. Dkt. No. 31 ¶¶ 80–83, 88–94. SpaceX's reliance on the Dunn declaration to bolster its argument is improper in response to Defendants' facial challenge.

Finally, SpaceX's reliance on cases permitting organizational standing based on a diversion-of-resources theory is unavailing. First, they are no longer good law following the Supreme Court's recent decision that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024); *see Ariz. All. for Retired Americans v. Mayes*, 117 F.4th 1165, 1177–78 (9th Cir. 2024) (en banc) (overruling cases that permitted Article III standing based on "frustration-of-mission and diversion-of-resource theories the Supreme Court rejected in *Hippocratic Medicine*"). Second, it is not clear that cases involving associations challenging action not directed at them are pertinent. Here, the Commission's vote was directed at SpaceX. The lack of standing arises

---

[6] At the hearing, SpaceX argued that its retaliation claim was not limited to the October 10 vote. Count 5 begins by alleging that "[t]he Commission's 6–4 vote against SpaceX's plan to increase Falcon 9 launches was substantially based upon the Commissioners' bias and animus against SpaceX based on the political views of its largest shareholder and CEO, Elon Musk. It therefore constitutes prohibited retaliation . . . ." Dkt. No. 31 ¶ 147. While other actions are mentioned in vague terms, the FAC does not adequately put Defendants or the Court on notice of any other specific decision or action by any specific Defendant or Defendants as to which SpaceX intends to allege a retaliation claim.

from the FAC's failure to identify injury—including any resources SpaceX was forced to spend—that resulted from the vote.[7]

Accordingly, SpaceX has not met its burden to establish jurisdiction, and Count 5 is dismissed without prejudice for lack of Article III standing.

C.

Count 6 alleges that the October 10, 2024 hearing and other unspecified proceedings were tainted by political bias and animus, depriving SpaceX of due process in violation of the Fourteenth Amendment. Dkt. No. 31 ¶¶ 163–74. Defendants seek dismissal of this claim both for lack of Article III standing and on the merits.

As with Count 5, SpaceX has not adequately identified a cognizable injury arising from Defendants' challenged conduct. Even assuming that the Commission's vote not to concur in the Air Force's consistency determination was procedurally improper, the Air Force overrode the Commission's objection and permitted SpaceX to increase its launch cadence. Count 6 relies in part on the assertion of SpaceX's "constitutionally protected property interest in its business of launching Falcon 9 rockets on the Base," Dkt. No. 31 ¶ 170, but it is not clear how SpaceX claims to have been deprived of that interest, as it remains able to launch its rockets. Count 6 also invokes a liberty interest "to petition the government, including proceedings before the Commission, without facing bias or reprisal." *Id.* ¶ 169. But "the deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (cleaned up). While SpaceX has a concrete interest in launching its rockets, the FAC does not allege how that right was "affected by the deprivation"—i.e., the Commission's alleged failure to provide an unbiased hearing. Stated differently, to the extent SpaceX had a right to petition for increased rocket launches, it has not

---

[7] Because the FAC does not identify any particular expenses SpaceX was forced to incur as a result of the Commission's vote, the Court does not decide whether the expenditure of resources—or any particular threshold of expense—is sufficient to establish Article III injury in the circumstances alleged.

shown that the Commission's allegedly biased vote harmed SpaceX given that the ultimate decisionmaker—the Air Force—granted the "petition."[8]

Because the FAC does not allege any facts plausibly showing that SpaceX was harmed by Defendants' alleged violation of its due process rights, Count 6 is dismissed for lack of Article III standing.

### IV.

Defendants' motion to dismiss under Rule 12(b)(1) is granted, and the FAC is dismissed without prejudice for lack of subject-matter jurisdiction.[9] The Court grants SpaceX's unopposed request at the hearing for leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Before the amendment, the parties shall meet and confer in person or by videoconference to discuss each claim SpaceX wishes to pursue and to attempt in good faith to resolve or narrow their disputes and reduce the issues that will be presented to the Court. SpaceX shall file its Second Amended Complaint (SAC) no later than March 28, 2025, and Defendants shall answer or otherwise respond to the SAC no later than April 11, 2025. SpaceX is cautioned that if Defendants move to dismiss the SAC for lack of standing, the Court does not expect to allow SpaceX again to amend its pleading to add allegations that could have been included in its SAC.

Date: March 14, 2025

_____
Stanley Blumenfeld, Jr.
United States District Judge

---

[8] The other property and liberty interests SpaceX invokes in its opposition are not mentioned in the FAC and therefore irrelevant to Defendants' facial challenge.

[9] The Court does not reach Defendants' arguments about prudential standing, sovereign immunity, or the merits of Count 6.