UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES, CORP., | Case No. 2:24-cv-08893-SB-SK |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT [DKT. NO. 56] |
| CALIFORNIA COASTAL COMMISSION et al., | |
| Defendants. | |

Plaintiff Space Exploration Technologies, Corp. (SpaceX) contracts with the U.S. Air Force to launch rockets from the Vandenberg Space Force Base, located on the California coast. In this action, SpaceX contends that the California Coastal Commission and its members and staff have exceeded their lawful authority and improperly attempted to regulate SpaceX's launches in reaction to the political activities of SpaceX's founder and CEO, Elon Musk. The Court granted Defendants' motion to dismiss the First Amended Complaint (FAC) for lack of ripeness and standing but allowed SpaceX to amend. Defendants now move to dismiss the Second Amended Complaint (SAC) for lack of ripeness and standing and for failure to state a claim. The Court held a hearing on May 30, 2025. Because the SAC cures many of the deficiencies in the FAC, the motion is largely denied as to the official-capacity claims, except that SpaceX fails to state a claim for violation of procedural due process. The motion is granted as to the Commission and the individual-capacity claims.

I.

In its order dismissing the FAC, the Court began with an explanation of the regulatory background before describing the specific facts giving rise to this case. Because an understanding of the statutory scheme governing activities on coastal

1

land is necessary to understand the parties' dispute, the Court repeats its explanation of that scheme before turning to the case's history and the new allegations in the SAC.

## A.

The Coastal Zone Management Act (CZMA) authorizes the U.S. Secretary of Commerce to review and approve coastal management programs submitted by states. 16 U.S.C. § 1455(d). Each management program must identify the coastal zone subject to the program, designate permissible land and water uses, and create enforceable policies governing activity in the coastal zone. *Id*. The CZMA excludes from the states' coastal zones land that is "subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents." *Id*. § 1453(1); 15 C.F.R. § 923.33(a).

California has implemented the CZMA through the California Coastal Act, which constitutes its coastal zone management plan. Cal. Pub. Res. Code § 30008. The Coastal Act established the Commission, an agency with 12 voting members. *Id*. §§ 30300, 30301, 30301.5. The Coastal Act requires those wishing to "perform or undertake any development in the coastal zone" to obtain a coastal development permit (CDP) from either the Commission or a local government. *Id*. § 30600(a). The Coastal Act acknowledges the exclusion of federal land from the coastal zone but asserts residual authority over that land to the extent permitted by law. *Id*. § 30008 ("[W]ithin federal lands excluded from the coastal zone pursuant to the [CZMA], the State of California shall, consistent with applicable federal and state laws, continue to exercise the full range of powers, rights, and privileges it now possesses or which may be granted.").

Two types of activity reviewable under the CZMA are especially relevant here. First, "Federal agency activity" includes "any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities." 15 C.F.R. § 930.31(a). When federal agency activity—including activity outside the coastal zone—affects land or water use in the coastal zone, the CZMA requires the federal agency to submit a "consistency determination" to the relevant state agency (here, the Commission) and ensure that the project is, "to the maximum extent practicable, consistent with the enforceable policies of approved state management programs." 16 U.S.C. § 1456(c)(1)(C). The state agency may concur or object, but the federal agency may proceed with the activity over the state's objection if it determines that doing so "is fully consistent with the enforceable policies of the management program." 15 C.F.R. § 930.43(d).

Second, persons conducting certain federally permitted activity—i.e., activity that requires a federal license or permit—that affects the land or water in the coastal zone must submit a consistency certification to the state agency, certifying that "the proposed activity complies with the enforceable policies of the state's approved program and that such activity will be conducted in a manner consistent with the program." 16 U.S.C. § 1456(c)(3)(A). The state agency may object, and, as with federal agency activity, the Secretary of Commerce may override the objection upon determining that the activity is consistent with the objectives of the CZMA or necessary for national security. *Id*.

Federally permitted activity requires a consistency certification in two circumstances. First, the state maintains a list of federally permitted activities that affect coastal use or resources, for which a certification is required. 15 C.F.R. § 930.53(a) ("State agencies shall develop a list of federal license or permit activities which affect any coastal use or resource, including reasonably foreseeable effects, and which the State agency wishes to review for consistency with the management program."). Second, states may request that the Director of the National Oceanic and Atmospheric Association (NOAA) require a consistency certification for federally permitted activities not listed by the state. "If the Director approves the State agency's request, the Federal agency and applicant must comply with the consistency certification procedures," but "[i]f the Director disapproves the State agency's request, the Federal agency may approve the license or permit application and the applicant need not comply with [those] requirements." 15 C.F.R. § 930.54(d). It is undisputed that launch programs are not included among California's listed federally permitted activities that require a consistency certification and that the NOAA Director has not approved any request for such a requirement.

B.

The Court previously described the central facts alleged in the FAC, which need not be repeated here. Dkt. No. 51 at 3–6. The SAC largely realleges those facts and adds further allegations to address the deficiencies identified in the dismissal order. The Court briefly summarizes the most significant changes, which are reflected in the "redlined" copy of the SAC at Dkt. No. 61.

First, the SAC shifts its focus away from the Commission's October 10, 2024 vote not to concur in the Air Force's approval of SpaceX's launch cadence increase, alleging that the vote was only one example of Defendants' bias in a

3

broader pattern of singling SpaceX out for adverse treatment. *See, e.g.*, Dkt. No.
55 ¶ 4 ("The Commission's bias against SpaceX . . . was made express not just that
day, but also during other Commission meetings."); *id*. ¶ 109 ("[A]nimus against
SpaceX's CEO and his political beliefs motivated the Commissioners' attempts
over the past year, which continue today, to single out SpaceX for burdensome
regulation."); *id*. ¶ 194 (alleging First Amendment violations based on "the
Commission's course of conduct against SpaceX throughout 2024—including its
actions to regulate SpaceX's launches as federally permitted activity, and demands
that SpaceX obtain a CDP, and decision to not concur in the Air Force's
consistency determination").

Second, the SAC explains the enforcement mechanisms in the Coastal Act
that the Commission and its staff allegedly could employ against SpaceX. *Id*.
¶¶ 52–55. For example, upon determining that someone is undertaking action that
requires a permit but has not obtained one, the Commission or its executive
director may issue a cease-and-desist order. *Id*. ¶ 52; Cal. Pub. Res. Code
§§ 30809, 30810. A cease-and-desist order issued by the executive director is
"effective upon its issuance," and violators may be subject to fines. Cal. Pub. Res.
Code § 30809(b)(3), (d). The Commission may impose civil penalties of up to
$11,250 per day for five years for certain violations, and intentional or negligent
violations of a cease-and-desist order may also result in civil liability of up to
$6,000 per day. Dkt. No. 55 ¶ 54; Cal. Pub. Res. Code §§ 30820, 30821, 30821.6.
"Any person" may maintain an action to recover these civil penalties or to seek
declaratory or injunctive relief. Dkt. No. 55 ¶ 55; Cal. Pub. Res. Code §§ 30803,
30805.

Third, the SAC includes additional details about various reports and
correspondence—mostly from Commission staff—threatening consequences if no
CDP was obtained. *E.g.*, Dkt. No. 55 ¶ 93 (quoting staff report stating that "[i]f
Space Force is not able to submit additional information to support its position that
SpaceX's proposed launch cadence is a federal agency activity, then SpaceX must
submit a coastal development permit ('CDP') application to authorize its increased
launch cadence; ***failure to do so may result in an enforcement action against
SpaceX*** if it commences development without a Commission-approved CDP."); *id*.
¶ 102 ("[O]n August 19, 2024, Deputy Director Teufel sent SpaceX an email
requesting to meet regarding its 'submittal of a coastal development permit
application.' On August 23, 2024, Mr. Teufel sent another email warning that
'[p]rogress on [SpaceX's] permit application will be key to th[e] October hearing
[regarding the proposed launch increase] going well.'"); *id*. ¶ 103 ("Mr. Teufel
threatened enforcement against SpaceX and stated: '***Without a [coastal***

*development] permit, there is no path forward.*'"). The SAC also describes how
the Commission has "doubled down on its position" that a CDP is required since
the October 10, 2024 meeting. *Id.* ¶¶ 118–21.

Fourth, the SAC modifies the allegations about the Air Force's response to
the Commission's September 16, 2024 demands for additional conditions, both to
add detail and to focus on the burdens on SpaceX. Whereas the FAC alleged the
costs were imposed on "commercial space operators, including SpaceX," the SAC
alleges that the additional monitoring to which the Air Force agreed costs SpaceX
millions of dollars per year and that "[t]hese requirements do not apply to other
commercial space operators that have launched from the Base and have not been
incurred by other operators." Dkt. No. 31 ¶ 94; Dkt. No. 55 ¶ 100. The SAC also
alleges on information and belief that "the Air Force will withdraw or limit at least
some of these requirements, significantly reducing costs to SpaceX, if it is
established that the Commission's demands for monitoring and mitigation
measures outside of the coastal zone exceed its authority under the CZMA." Dkt.
No. 55 ¶ 100.

Fifth, the SAC adds numerous allegations about how SpaceX is harmed by
Defendants' actions. *Id.* ¶¶ 122–38. Essentially, SpaceX contends that it faces a
"Hobson's choice" between (1) proceeding with its Falcon 9 launches without a
CDP and risking an enforcement action and attendant penalties or (2) suspending
operations at the base and submitting to a costly and unpredictable regulatory
process before the hostile Commission. *Id.* ¶ 123. The SAC alleges that SpaceX
faces more than $1 million in civil or administrative fines for past launches alone,
with higher exposure if the Commission treats its activities as subject to daily
penalties. *Id.* ¶ 124. The threat of enforcement is allegedly heightened because of
(1) the Commission's repeated demands for a CDP, (2) the commissioners' animus
toward SpaceX and Musk, (3) SpaceX's intended launch cadence increase to 100
launches a year, and (4) the Commission's "long history of aggressively enforcing
the CDP requirement." *Id.* ¶¶ 125–26. On the other hand, if SpaceX seeks a CDP,
it will have to hire consultants and lawyers, commit employee time, pay the
application fee, and suffer costly delays to its operations, all with no guarantee that
the CDP application would be granted. *Id.* ¶¶ 127–28. SpaceX has spent hundreds
of millions of dollars developing launch sites and infrastructure at the base, and the
approval process could take more than half a year, severely disrupting SpaceX's
business and contractual obligations. *Id.* ¶ 128. Interruptions in the Falcon 9
program would delay SpaceX's receipt of billions of dollars in revenue. *Id.* ¶ 130.

SpaceX alleges that Defendants' demands for a CDP and enforcement threats "have already forced SpaceX to expend resources" to plan how it could fulfill its contractual obligations using other federal launch sites. *Id.* Because space launches "require careful, advanced planning to insert payloads into orbit" safely, "[t]he threat of a cease-and-desist order issued at the eleventh hour of a launch raises heightened operational risks that SpaceX cannot ignore." *Id.* ¶ 131. Based on the Commission's demands, SpaceX has already spent hundreds of hours of employee time and tens of thousands of dollars for outside consultants and attorneys to appear before the Commission and its staff, in addition to the costs from this litigation. *Id.* ¶ 133.

SpaceX has also "been required to implement costly measures" to satisfy the mitigation and monitoring requirements imposed by the Air Force to satisfy the Commission, even though the Air Force allegedly found the measures unnecessary. *Id.* ¶ 134. The SAC alleges that "[n]o other commercial space operator has been required to comply with or pay for most or all of these burdensome measures related to impacts outside of the coastal zone that have been imposed on SpaceX," and that SpaceX will not need to implement all the measures if the Court determines that the Commission lacks authority to regulate operations on the base. *Id.* ¶ 135. Because the Commission has not made similar demands of any other commercial space operator (and even approved a 60-launch annual cadence for another operator without requesting a CDP), the regulatory burdens on SpaceX put it at a competitive disadvantage. *Id.* ¶¶ 136–37.

The SAC also alleges that false claims made by various commissioners at public hearings about SpaceX—including that it cannot be trusted to act in the interests of the United States, that it acted against the interests of Ukraine, and that Musk has bigoted beliefs—have harmed its goodwill. *Id.* ¶ 138. By damaging SpaceX's reputation, Defendants have hurt its "ability to attract and maintain its economic relationships with the United States and other countries and customers." *Id.*

Sixth, the SAC substantially revises Count 1, which previously was focused only on the demand for a consistency certification, to request a declaration that Defendants' demand for SpaceX to obtain a CDP, like their other regulatory demands, is unlawful under the CZMA. *Id.* ¶¶ 139–50.

Finally, the SAC expands Counts 5 and 6 (alleging First Amendment and due-process violations under 42 U.S.C. § 1983) to challenge Defendants' entire course of conduct, rather than focusing solely on the October 2024 vote not to

concur in the Air Force's consistency determination. *Id*. ¶¶ 179–210. SpaceX has also dropped its claim against Catherine Rice in her individual capacity.

Thus, the SAC alleges essentially the same six causes of action as the FAC, with the modifications already mentioned. It seeks declaratory and injunctive relief that: (1) the CZMA does not require SpaceX to obtain a CDP or consistency certification because the base is not within the "coastal zone"; (2) the Commission's demand that SpaceX obtain a CDP is preempted by the CZMA; (3) the Commission's demand for a CDP is unlawful under the Federal Enclave Clause; (4) the Commission's demand for a CDP violates the Coastal Act; (5) the Commission retaliated against SpaceX for Musk's protected speech in violation of the First Amendment; and (6) the Commission deprived SpaceX of the due process of law through its biased and retaliatory administration of the CZMA and the Coastal Act. All six claims are alleged against the Commission, two staff members, and the commissioners in their official capacities. The final two claims also seek nominal, actual, and punitive damages from four commissioners in their individual capacities (Caryl Hart, Justin Cummings, Mike Wilson, and Gretchen Newsom).

Contending that SpaceX has not cured the deficiencies identified in the FAC, Defendants again move to dismiss all claims for lack of jurisdiction under Rule 12(b)(1) and Count 6 for failure to state a claim under Rule 12(b)(6). Dkt. No. 56.

## II.

As in their prior motion, Defendants raise a series of jurisdictional and quasi-jurisdictional arguments under Rule 12(b)(1), arguing that: (1) Counts 1–4 are not ripe under either constitutional or prudential ripeness principles; (2) SpaceX lacks Article III standing as to part of Count 1 and Counts 5 and 6; and (3) sovereign immunity bars all claims against the Commission and the requests for retrospective relief in Counts 5 and 6 against the commissioners in their official capacities. The Court begins with the Article III ripeness and standing challenges. *See Calderon v. Ashmus*, 523 U.S. 740, 745 (1998) (explaining that "we must first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited" before reaching sovereign immunity issues under the Eleventh Amendment).

A complaint must be dismissed under Rule 12(b)(1) if the plaintiff lacks Article III standing to sue. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir.

2011).  The standing doctrine is derived from Article III's limitation on the judicial power of federal courts to hear only "actual cases or controversies."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.* at 338.  Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  "The irreducible constitutional minimum of standing consists of three elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 578 U.S. at 338 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (cleaned up).  The party invoking federal jurisdiction bears the burden of demonstrating that Article III is satisfied. *TransUnion*, 594 U.S. at 442.

The doctrine of ripeness has two components, drawing from both Article III limitations on judicial power and prudential reasons for refusing to exercise jurisdiction.  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  Constitutional ripeness "is synonymous with the injury-in-fact prong of the standing inquiry."  *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022). Whether framed as a question of standing or ripeness under Article III, the plaintiff's injury must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Id*. (quoting *Lujan*, 504 U.S. at 560).

Jurisdictional challenges under Rule 12(b)(1) may be facial or factual.  Here, Defendants specify that they bring a facial attack.  Dkt. No. 56 at 2 of 32.  Unlike a factual attack, which permits the court to review evidence beyond the complaint, "[i]n a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).[1]  The court evaluates a

---

[1] Courts may take judicial notice of matters of public record in ruling on a facial jurisdictional attack.  *Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017). Defendants request judicial notice of (1) the certified transcript of the October 10, 2024 Commission meeting and (2) the Commission's February 6, 2025 adopted revised findings.  Defendants' request is granted without opposition as to the transcript, which is a matter of public record and central to the SAC.  The request is denied as moot as to the February 6 findings (to which SpaceX partially objects)

facial attack "as it would a motion to dismiss under Rule 12(b)(6): Accepting the
plaintiff's allegations as true and drawing all reasonable inferences in the
plaintiff's favor, the court determines whether the allegations are sufficient as a
legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117,
1121 (9th Cir. 2014).

III.

The Court turns first to Defendants' ripeness challenge to the first four
claims for declaratory and injunctive relief, which the parties address collectively,
before addressing the Article III standing challenge and sovereign immunity.

A.

The first four claims in the SAC seek declaratory and injunctive relief
focused on Defendants' demand that SpaceX obtain a CDP, with each claim
alleging a separate basis for finding the demand unlawful. The Court dismissed
the corresponding claims in the FAC for lack of Article III ripeness because
SpaceX improperly relied on evidence outside the pleadings and the FAC
contained only a few conclusory references to any threatened enforcement or any
costs borne by SpaceX. In the SAC, SpaceX has provided additional allegations
about the harms it claims to be facing, both from the threat of enforcement and in
economic costs already incurred in response to Defendants' demands for a CDP.

1.

Taking the allegations in the SAC as true, SpaceX has alleged an actual case
or controversy over whether it must obtain a CDP to conduct its Falcon 9 launches.
SpaceX invokes a variety of ripeness theories, but one suffices: the harm it faces
from Defendants' threatened enforcement of the CDP requirement.

"An allegation of future injury may suffice [to satisfy Article III] if the
threatened injury is certainly impending, or there is a substantial risk that the harm
will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned
up). Thus, when the threat that the government will enforce a law against the
plaintiff is "sufficiently imminent," he need not wait to be subjected to an arrest,
prosecution, or enforcement action before challenging the law. *Id.* at 158–59.

---

because Defendants' motion references them only once as part of the background,
and they have no bearing on the Court's analysis.

Instead, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an
intention to engage in a course of conduct arguably affected with a constitutional
interest, but proscribed by a statute, and there exists a credible threat of prosecution
thereunder.'" *Id*. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298
(1979)).

As the Court observed in connection with the motion to dismiss the FAC,
this case is an atypical pre-enforcement challenge: SpaceX does not contend that it
wishes to take action prohibited by any law, but rather that the Commission is
threatening enforcement action based on a mistaken interpretation of the CZMA
and the Coastal Act. In an analogous situation, the Ninth Circuit found the
*Driehaus* test satisfied based on the defendant's interpretation of the challenged
statute. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024). The panel
noted the "unusual" fact that although the plaintiff argued on the merits that the
challenged statute did not apply to it, "[i]n order to establish standing, the would-
be sanctioned party . . . must argue that the law *does* apply, while the would-be
enforcing party. . . could defeat standing by conceding that the law does *not*
apply." *Id*. But the court found no need to "go further down this rabbit hole"
because the plaintiff plausibly alleged that it had refrained from acting based on the
attorney general's interpretation of the act. *Id*. (cleaned up).

Consistent with the approach in *Peace Ranch*, the parties do not dispute the
first two prongs of the *Driehaus* test (i.e., that SpaceX intends to take action that
arguably implicates a constitutional interest and that is arguably legally
proscribed), focusing instead on its final prong—whether there is a credible threat
of enforcement. "In evaluating the genuineness of a claimed threat of
prosecution," the Ninth Circuit looks to three factors: (1) "whether the plaintiffs
have articulated a 'concrete plan' to violate the law in question," (2) "whether the
prosecuting authorities have communicated a specific warning or threat to initiate
proceedings," and (3) "the history of past prosecution or enforcement under the
challenged statute." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134,
1139 (9th Cir. 2000) (en banc); *see also, e.g.*, *Arizona v. Yellen*, 34 F.4th 841, 850
(9th Cir. 2022) (applying the three-factor *Thomas* test to analyze the third *Driehaus*
factor). Moreover, whether the threat of enforcement is credible "often rises or
falls with the enforcing authority's willingness to disavow enforcement." *Peace
Ranch*, 93 F.4th at 490.

Applying these factors, the allegations in the SAC plausibly allege a credible
threat of enforcement. First, SpaceX has much more than a concrete plan to take
action that, according to the Commission, violates the Coastal Act; it is already

10

conducting launches without a CDP, which the Commission—through its staff and
in statements by a majority of its voting members—has repeatedly claimed is
unlawful.  Second, the SAC alleges at least one instance of a specific threat of
enforcement:  A May 2024 Commission staff report took the position that SpaceX
must submit a CDP application and that "a failure to do so may result in an
enforcement action against SpaceX."  Dkt. No. 55 ¶ 93; *id*., ex. K at 11.  Third, the
SAC alleges that the Commission "has a long history of aggressively enforcing the
CDP requirement," including opening scores of cases involving CDP violations in
2023 and 2024.  *Id*. ¶ 126.  The Commission "has even acted to aggressively
enforce the CDP requirement against projects occurring on military bases or that
have been federally approved" and "has repeatedly made known to SpaceX that it
has previously required other businesses with operations on military bases in
California to obtain CDPs."  *Id*.  Enforcement actions carry the threat of thousands
of dollars of fines daily.  Finally, Defendants have conspicuously declined to
disavow either their position that SpaceX needs a CDP or the possibility of
enforcement actions against it, instead asserting that "[w]hile Defendants have not
disavowed enforcement of a potential CDP requirement, this factor is not
dispositive."  Dkt. No. 63 at 3.  At the hearing, Defendants again reiterated that
they are not prepared to disavow enforcement.

To be sure, not every consideration weighs heavily in favor of finding
ripeness.  As to the second *Thomas* factor (a specific warning or threat by the
prosecuting authority to initiate enforcement), SpaceX overstates the significance
of Defendants' enforcement threats.  The SAC contains several conclusory
allegations that Defendants "threatened enforcement," which the Court previously
found inadequate.  Dkt. No. 55 ¶¶ 101, 103, 122.  Otherwise, the SAC recounts
numerous instances of Defendants communicating their view that SpaceX's
activities require a CDP, but only one specific allegation of an actual threat to
initiate enforcement proceedings—the May 2024 staff report referenced above.
Defendants also correctly emphasize that the potential enforcement actions
identified by SpaceX cannot be initiated without advance notice.  *E.g.*, Cal. Pub.
Res. Code § 30809(b) (permitting executive director to issue cease-and-desist order
"only if the person or agency has failed to respond in a satisfactory manner" to
formal notice that contains specified information).  There is no allegation that the
executive director or the Commission has issued formal notice of an intent to
initiate an enforcement action.  This absence is particularly noteworthy given that
the Commission's staff threatened enforcement in May 2024, but SpaceX has
continued to operate for a year without applying for a CDP, and Defendants still
have not initiated the threatened enforcement action.  Thus, it is not clear that the
risk of enforcement is "nearly inevitable," as the SAC alleges.  Dkt. No. 55 ¶ 125.

But SpaceX need not establish inevitability; it must only show that the threat of enforcement is credible.  In *Peace Ranch*, the Ninth Circuit found the attorney general's refusal to disavow an intent to enforce the challenged law, together with his admission that the law targeted the plaintiff, sufficient to substantiate a threat of enforcement even though no threat to enforce the law had ever been expressed.  93 F.4th at 490; *see also Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (state's refusal to disavow enforcement of challenged statute during litigation was "strong evidence" of a credible threat).  Here, there has been at least some expression of intent to enforce the law, *plus* numerous assertions of Defendants' belief that SpaceX is violating the law, *plus* an acknowledged unwillingness to disavow enforcement, *plus* an alleged history of enforcement actions by the Commission for CDP violations, even for conduct on military bases.[2]  Dkt. No. 55 ¶¶ 93, 126.  Defendants argue that the SAC does not allege any past enforcement of a CDP requirement against a commercial space operator, but that is consistent with the SAC's allegations that SpaceX has been singled out for adverse treatment based on Defendants' animus.  Moreover, Defendants have not shown that the Commission's history of enforcing the CDP requirement against other activities on military bases is irrelevant just because the subjects of those enforcement actions were not commercial space operators.  The sole case on which they rely in support is distinguishable.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1125 (9th Cir. 2009) (finding no credible threat of enforcement where defendant had no authority to bring an enforcement action or issue penalties).

In sum, SpaceX has plausibly alleged a ripe, nonspeculative case or controversy over whether it must obtain a CDP to continue its Falcon 9 launches. The credible threat that Defendants will bring an enforcement action and subject

---

[2] Defendants argue that the Commission can act only by majority vote, so statements by its staff or individual commissioners are not attributable to the Commission.  Like the FAC, however, the SAC alleges that the Commission's staff have issued numerous reports demanding a CDP from SpaceX and that a majority of voting commissioners at the October 10, 2024 meeting agreed with that position.  Particularly when combined with the alleged history of enforcement by the Commission and the fact that all Defendants—including the Commission— have declined to disavow enforcement, the SAC plausibly alleges a threat of enforcement by the Commission.

SpaceX to daily fines for not having a CDP—which Defendants pointedly do not
disavow—is sufficient to establish an actual injury under Article III.[3]

Having found constitutional ripeness, the Court declines to dismiss the case
on prudential standing grounds. The dispute about whether SpaceX must obtain a
CDP is predominantly—if not entirely—legal in nature, and Defendants have
expressed bias against SpaceX and appear determined to hold the threat of
enforcement action over it. *See Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 65–
66 (9th Cir. 2024) (prudential ripeness is discretionary, and courts principally
consider the fitness of the issues for judicial review and the hardship to the parties
of withholding a decision). Accordingly, the motion to dismiss Counts 1 through 4
is denied to the extent those claims are premised on the parties' dispute over the
CDP requirement.[4]

2.

Although the Court observed in connection with the FAC that there did not
appear to be a live dispute about consistency certifications, the SAC continues to
seek declaratory relief about whether a consistency certification is required as part
of Count 1 and in the prayer for relief. In contrast to the CDP requirement,
Defendants in this litigation *have* consistently disavowed any suggestion that
SpaceX must obtain a consistency certification, as the SAC itself acknowledges.
Dkt. No. 55 ¶ 121 ("[T]he Attorney General's office has conceded during litigation

---

[3] Defendants' briefing makes no distinction among the Commission and the
various official-capacity defendants for purposes of their ripeness challenge, which
focuses on whether SpaceX has been injured. At the hearing, Defendants for the
first time suggested that some of the official-capacity defendants should be
dropped, citing as an example Commissioner Effie Turnbull-Sanders. This
argument was not raised in Defendants' motion or reply, and SpaceX has not had a
fair opportunity to respond. Moreover, Defendants have not shown that separate
analysis of the claims against the various official-capacity defendants is required
given that each official-capacity claim is merely another way of asserting a claim
against the Commission.

[4] Because the Court finds that SpaceX's CDP-based claims are ripe under the pre-
enforcement challenge rubric, it need not consider whether SpaceX has also
established ripeness through the other theories it advances, such as being forced to
spend money and employee time to respond to Defendants' demands or being
subjected to competitive or reputational harm.

that the Commission cannot enforce its consistency certification demand unless commercial launches are added to the California Coastal Management Program[.]”); *see also* Dkt. No. 56 at 6 (Defendants’ motion acknowledging, as in the prior motion to dismiss, that “the Falcon 9 launch program does not presently fall within either of the classes of activities for which a consistency certification is required”).  Because SpaceX still has not alleged a ripe case or controversy over the undisputed fact that it does not need to obtain a consistency certification, its requests for relief related to a consistency certification are dismissed without prejudice as unripe.

3.

Defendants also argue that the portion of Count 1 challenging “the Commission’s demands that SpaceX implement mitigation and monitoring measures on the Base and other federal land” must be dismissed for lack of Article III standing.  Dkt. No. 55 ¶ 140.  SpaceX clarifies in its opposition that it does not allege a distinct “mitigation and monitoring claim,” but rather raises those allegations merely to demonstrate some of the harm it faces because of the dispute over whether its launch program is federal agency activity in the coastal zone. Dkt. No. 59 at 12 n.5.  In light of SpaceX’s clarification, the request in Count 1 that “the Commission’s demands that SpaceX . . . implement mitigation and monitoring measures on the Base and other federal lands should be declared unlawful under the CZMA in the circumstances presented, declared unenforceable against SpaceX, and enjoined” is dismissed as abandoned to the extent it seeks relief distinct from declaratory and injunctive relief about whether a CDP is required.  Dkt. No. 55 ¶ 149.

B.

Count 5 of the FAC alleged that the Commission’s 6–4 vote in October 2024 not to concur in the Air Force’s consistency determination was taken in retaliation for Musk’s protected speech, in violation of the First Amendment.[5]  The Court dismissed the claim for lack of standing because SpaceX had not shown how it was harmed by the Commission’s vote, since the Air Force overrode the Commission’s objection, and SpaceX’s launches have not been impeded.

---

[5] Defendants have not challenged SpaceX’s First Amendment claim on the merits. The Court assumes without deciding that SpaceX may bring its claim for retaliation that is predicated on Musk’s protected speech rather than its own.

14

In the SAC, SpaceX amended Count 5 to allege First Amendment retaliation based on the Commission's "course of conduct against SpaceX throughout 2024," including its October 2024 vote, "its actions to regulate SpaceX's launches as federally permitted activity, and [its] demands that SpaceX obtain a CDP." *Id.* ¶ 194.  SpaceX claims that it was harmed by the Commission's "threatened enforcement and the cost and delay of burdensome permitting and approval processes the Commission unlawfully seeks to impose." *Id.* ¶ 193.  For this alleged retaliation, SpaceX seeks nominal, compensatory, and punitive damages against Hart, Cummings, Wilson, and Newsom in their individual capacities, along with declaratory and injunctive relief against all Defendants.  Defendants again move to dismiss the retaliation claim for lack of Article III standing, arguing that the SAC does not establish injury, causation, or redressability as to the Commission or the individual defendants.

For the same reasons that SpaceX has shown Article III ripeness for Counts 1 through 4, it has established an injury-in-fact for its First Amendment claim against the Commission premised on the same conduct—the Commission's allegedly retaliatory CDP demands and attempts to regulate the launches.  *See Twitter*, 56 F.4th at 1173 (constitutional ripeness and injury-in-fact for constitutional standing are "synonymous").  Traceability and redressability are also satisfied:  the threat of an enforcement action comes entirely from the Commission and would be eliminated by an injunction or declaration holding that SpaceX need not obtain a CDP.  To the extent SpaceX's retaliation claim is based on the October 2024 vote, the SAC still does not identify any injury caused by the Commission's decision, which the Air Force overrode.  Thus, the retaliation claim is dismissed against the Commission—and the commissioners in their official capacities (which is merely another way of bringing claims against the Commission)—for lack of standing only to the extent it seeks relief relating to the October 2024 vote.

As for the individual-capacity claims against Hart, Cummings, Wilson, and Newsom, the SAC does not establish Article III standing for a First Amendment retaliation claim.  Count 5 recites a few statements by these commissioners at public hearings that allegedly "show[] that political bias and disagreement with the protected speech of Mr. Musk motivated the Commission's actions adversely affecting SpaceX," but it contains no allegations explaining how SpaceX was injured by any of those statements.  Dkt. No. 55 ¶ 185.  For example, the SAC does not allege that Hart, Cummings, Wilson, or Newsom personally threatened enforcement actions against SpaceX or had any involvement in the staff reports demanding a CDP, let alone in the May 7, 2024 staff report that threatened

enforcement action (which predated any of the commissioners' statements supporting Count 5). *Id.* ¶¶ 186–89. Thus, the SAC does not plausibly allege that any of the individual commissioners' biased statements caused the injury that gives rise to Article III standing against the Commission. Although SpaceX invoked vicarious liability at the hearing, it has not identified any authority suggesting that commissioners in their individual capacities are vicariously liable for actions of the Commission's staff, at least absent circumstances establishing control and causation not present here. *Cf. Meyer v. Holley*, 537 U.S. 280, 286, (2003) (explaining that under traditional vicarious liability rules, "in the absence of special circumstances it is the corporation, not its owner or officer, who is . . . subject to vicarious liability for torts committed by its employees or agents").

SpaceX's opposition fails to address these deficiencies. It combines its discussion of standing for both § 1983 claims (i.e., the First Amendment claim in Count 5 and the due-process claim in Count 6) and addresses the individual commissioners only in connection with the due-process claim, relying solely on *Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995), a case that does not mention First Amendment retaliation. At the hearing, Plaintiff again relied on *Stivers* in support of both claims and asserted that *Stivers* allowed a retaliation claim to proceed against agency officials in their individual capacities. It did not. The only claims at issue in *Stivers* were for violation of due process and equal protection, and the opinion does not reference either the First Amendment or retaliation more broadly. In any event, SpaceX has not plausibly alleged a causal connection between its alleged injury (the threat of enforcement by Commission staff) and the alleged biased statements by Hart, Cummings, Wilson, and Newsom, and *Stivers* does not suggest otherwise.

At the hearing, SpaceX also invoked *Jacobs v. Clark County School District*, 526 F.3d 419 (9th Cir. 2008), to argue that it had standing to pursue nominal damages against the individual defendants because the constitutional violation itself is a cognizable injury. *Jacobs* did not involve allegations of retaliation; rather, the plaintiffs were students and their families who challenged a school district's mandatory dress policy. The Ninth Circuit held that two students had standing to bring claims for nominal damages because the "deprivation of [their] First Amendment right to communicate a particular written message on [their] clothing" was an injury in fact caused by the defendant's school uniform policy that would be redressed by a finding that the policy was unconstitutional. *Id*. at 426–27. Here, in contrast, SpaceX identifies no message it wishes to communicate that any of the individual defendants has prevented it from expressing. Nor has SpaceX otherwise met its burden of establishing Article III standing for its First

Amendment retaliation claim against the individual-capacity defendants.[6]
Accordingly, SpaceX's First Amendment retaliation claim against Hart,
Cummings, Wilson, and Newsom in their individual capacities is dismissed for
lack of standing.

## C.

SpaceX alleges that Defendants violated its Fourteenth Amendment right to
due process by singling it out for disparate regulatory treatment based on bias and
animus. As with the retaliation claim, the SAC expands the due-process claim in
the FAC to challenge not only the October 2024 vote but also "the Commission's
actions to regulate SpaceX's launches as federally permitted activity [and]
demands that SpaceX obtain a CDP." Dkt. No. 55 ¶ 207. The due-process claim
relies on the same alleged injuries that give rise to the First Amendment retaliation
claim, including "the Commission's actions to regulate SpaceX's launches as
federally permitted activity [and] demands that SpaceX obtain a CDP." Dkt. No.
55 ¶ 207. As noted, SpaceX combines its discussion of standing for both claims in
its opposition, further underscoring that they challenge the same conduct and
invoke the same theories of harm.

Because the due-process claim is predicated on the same actions and alleges
the same injuries as the First Amendment retaliation claim, the Article III standing
analysis is the same as to the Commission and the commissioners in their official
capacities. As to those defendants, the Commission's threats of enforcement give
SpaceX standing to allege its due-process claim challenging the Commission's

---

[6] *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021), which SpaceX also invoked at
the hearing (but not in its briefing), addressed whether nominal damages could
satisfy Article III's redressability requirement. *Uzuegbunam* did not involve First
Amendment retaliation or the injury-in-fact requirement for Article III standing.
*See id.* at 292–93 ("This is not to say that a request for nominal damages
guarantees entry to court. Our holding concerns only redressability. It remains for
the plaintiff to establish the other elements of standing (such as a particularized
injury) . . . ."). Thus, contrary to SpaceX's contention at the hearing, *Uzuegbunam*
does not stand for the proposition that the possibility of nominal damages creates
standing in First Amendment cases even in the absence of an Article III injury. It
also does not stand for the proposition that a plaintiff who has been injured by one
defendant (e.g., by the Commission's threat of enforcement) thereby has Article III
standing to sue other defendants without a plausible showing that those defendants
caused the plaintiff's injury.

demands for a CDP.  On the other hand, SpaceX has not plausibly alleged that it was injured by the October 2024 vote not to concur in the Air Force's consistency determination, which the Air Force overruled.

As with the First Amendment claim, SpaceX has not demonstrated Article III standing to allege its due process claim against Hart, Cummings, Wilson, and Newsom in their individual capacities.  Count 6 does not identify any particular conduct by any of the individual commissioners, much less show how that conduct injured SpaceX.  The only references to the individual commissioners in Count 6 are three conclusory allegations about their biased and disparate treatment of SpaceX, without identifying any specific acts by any of them.  Dkt. No. 55 ¶¶ 203, 209–10.  Even assuming that the due-process claim is based on the same statements identified in Count 5, those statements do not give rise to standing against the commissioners in their individual capacities for the reasons explained above.  *Stivers*, on which SpaceX relies, stands for the proposition that "bias on the part of a single member of a tribunal taints the proceedings and violates due process," but it does not permit Article III standing without a showing of injury caused by the defendant.  71 F.3d at 748.  Because Count 6 does not identify any individual commissioner's action that harmed SpaceX, the claim is dismissed for lack of Article III standing against the individual defendants.

### D.

Defendants also invoke sovereign immunity.  Under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  This protection extends to "arms of the State," which "are not subject to suit under § 1983 in either federal court or state court."  *Howlett v. Rose*, 496 U.S. 356, 365 (1990).

Defendants argue that the claims against the Commission are barred by sovereign immunity.  *See Beck v. California*, 479 F. Supp. 392, 396 (C.D. Cal. 1979) (dismissing claims against the Commission because it is a state agency within the purview of the Eleventh Amendment).  SpaceX contends that the Commission has waived sovereign immunity because § 30334(b) of the Public Resources Code provides that it may "[s]ue and be sued."  But the Supreme Court has rejected this proposition, explaining that a state's waiver must be unequivocal, and a state "does [not] consent to suit in federal court merely by stating its intention to 'sue and be sued."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).

Accordingly, SpaceX's claims against the Commission are barred by sovereign immunity under the Eleventh Amendment and must be dismissed. This dismissal does not affect the claims for prospective injunctive and declaratory relief against the commissioners in their official capacities, which may proceed under *Ex parte Young*, 209 U.S. 123 (1908). *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) ("Whether the Commission waived its immunity is another question we need not decide, because . . . even absent waiver, [plaintiff] may proceed against the individual commissioners in their official capacities, pursuant to the doctrine of *Ex parte Young*.").[7]

## IV.

In addition to their jurisdictional and quasi-jurisdictional challenges under Rule 12(b)(1), Defendants argue that the SAC fails to state a plausible claim for violation of SpaceX's procedural due-process rights.

## A.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In resolving a Rule 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Assuming the veracity of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

---

[7] Defendants argue that the individual defendants in their official capacities are entitled to sovereign immunity as to the request for retrospective relief about the legality of the October 10, 2024 vote, but that argument is moot because the portions of SpaceX's § 1983 claims that are based on the October 2024 vote are dismissed for lack of Article III standing.

B.

A claim for violation of procedural due process requires:  "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process."  *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008) (cleaned up).  Defendants challenge only the first two elements.

SpaceX identifies four interests it contends are protected by the Constitution.  First, it contends that it has "a reasonable expectation of entitlement under California law to receive unbiased regulatory treatment by the Commission."  Dkt. No. 59 at 19.  SpaceX relies on § 30320 of the Public Resource Code, which requires the Commission to "conduct its affairs in an open, objective, and impartial manner free of undue influence and the abuse of power and authority."  But SpaceX identifies no substantive property interest created by § 30320, which merely describes *how* the Commission is to conduct its business.  *See Stiesberg v. California*, 80 F.3d 353, 357 (9th Cir. 1996) (statute prohibiting "punitive action" "merely provides procedural safeguards" and does not create a property interest).  SpaceX relies on cases finding a protectable property interest in a license if the procedural requirements for obtaining the license "are intended to be a significant substantive restriction on decision making."  *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994) (cleaned up).  But the SAC does not identify any license for which SpaceX has applied and been rejected.[8]  Nor does SpaceX identify any authority finding a property interest in "unbiased regulatory treatment" in the abstract.

Second, the SAC alleges a property interest in SpaceX's "government permits, licenses, leases, and contracts."  Dkt. No. 55 ¶ 205.  But neither the SAC nor the opposition identifies any permit, license, lease, or contract that SpaceX has been unable to obtain, or been deprived of, because of Defendants' bias.  SpaceX argued at the hearing that it "doesn't make sense" to treat Defendants' demand for a CDP as different from the denial of a permit, but it cites no authority for this argument.  Nor is it obvious that the first two elements of a procedural-due-process claim—deprivation of a protected property interest—are met when a plaintiff claims a property interest in a permit that has neither been sought nor denied.

Third, SpaceX invokes a constitutionally protected property interest in its business goodwill.  Although California has conferred property status to business

---

[8] SpaceX also invokes § 30604 of the California Resource Code, which governs issuance of CDPs, but SpaceX has not applied for a CDP.

goodwill, the Ninth Circuit has cautioned that mere damage to reputation does not implicate a constitutionally protected interest that gives rise to a § 1983 claim for deprivation of due process. Otherwise, "[a]ny adverse statement made by a city, county, or state official in the context of considering building permits, licenses, zoning, or similar activities could potentially constitute damage to . . . goodwill" and give rise to § 1983 liability. *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 375 (9th Cir. 1999). Thus, in *WMX*, the Ninth Circuit found no constitutionally protected property interest was at stake based only on "allegedly defamatory remarks made to the county and the public generally that could affect [the plaintiff's] business reputation." *Id*. at 376. The court distinguished *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989), which found a violation of a property interest in business goodwill where county officials sent letters directly to the plaintiff's customers, threatening to revoke their permits if they continued to accept deliveries from the plaintiff. *WMX*, 197 F.3d at 375.

The allegations in the SAC are akin to those in *WMX*, not *Soranno's*. As in *WMX*, the commissioners' comments are "allegedly defamatory remarks made to . . . the public generally that could affect [SpaceX's] business reputation." *Id*. at 376. The SAC does not allege any direct interference with SpaceX's relationships with any customers other than the Air Force. As to the Air Force, there is no plausible allegation that SpaceX's business goodwill has been damaged, as the Air Force overrode the Commission's objections and allowed SpaceX to increase its launches. SpaceX therefore has not alleged that it has been deprived of a protected property interest in its business goodwill.

Finally, SpaceX in its opposition invokes a "liberty interest to pursue its business at the Base without biased, retaliatory interference," citing *Wedges/Ledges* for the proposition that "the pursuit of an occupation or profession is a protected liberty interest." Dkt. No. 59 at 21 (quoting *Wedges/Ledges*, 24 F.3d at 65 n.4). This purported interest is not clearly alleged in the SAC. In any event, "the line of authorities establishing the liberty interest in pursuing a profession all deal with a complete prohibition of the right to engage in a calling." *Franceschi v. Yee*, 887 F.3d 927, 938 (9th Cir. 2018) (cleaned up).[9] SpaceX does not—and

---

[9] SpaceX emphasized at the hearing that the quoted language in *Franceschi* comes from its discussion of substantive due process. But *Franceschi* addressed the liberty interest identified in footnote 4 of *Wedges/Ledges*—which also discussed substantive due process and is the only authority cited by SpaceX in support of its claimed liberty interest to pursue its business. Thus, to the extent *Franceschi* is inapposite, it is only because SpaceX has invoked an inapposite liberty interest.

could not—allege that the Commission has forced it out of the business of launching rockets (at the base or otherwise).

Because the SAC does not identify any constitutionally protected property or liberty interest of which SpaceX has been deprived, it fails to state a claim for violation of procedural due process.

V.

Defendants' motion to dismiss the SAC is granted in part as follows: The portion of Count 1 seeking relief related to a consistency certification is dismissed against all defendants without prejudice as unripe, and the portion of Count 1 seeking relief related to mitigation and monitoring measures distinct from the CDP requirement is dismissed without prejudice as abandoned. The individual-capacity § 1983 claims for violations of the First Amendment and due process in Counts 5 and 6—along with the portions of those claims against the other defendants that are predicated on the October 10, 2024 vote—are dismissed without prejudice for lack of Article III standing. All remaining claims against the Commission are dismissed based on sovereign immunity. The remaining portion of SpaceX's due-process claim in Count 6 is dismissed on the merits with prejudice for failure to state a claim.

The motion is otherwise denied, and the official-capacity claims in Counts 1 through 5 predicated on the demand for a CDP and the Commission's allegedly biased attempts to regulate SpaceX's activity on the base remain for further adjudication.

Date: July 2, 2025

_____
Stanley Blumenfeld, Jr.
United States District Judge